## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **UNITED STATES OF AMERICA** *ex rel.* **[UNDER SEAL],**<br><br>             **Plaintiff,**<br><br>    v.<br><br>**[UNDER SEAL],**<br><br>             **Defendants.** | **CIVIL ACTION NO. 13-cv-0377**<br><br><br>**FILED UNDER SEAL**<br><br>**JURY TRIAL DEMANDED** |

## FILED IN CAMERA AND UNDER SEAL
## PURSUANT TO 31 U.S.C. §§ 3729 et seq.

BRIAN P. KENNEY, ESQUIRE
M.TAVENNER SHEPHERD DEMING, ESQUIRE
NY Bar No.:  5032669
KATHRYN M. SCHILLING, ESQUIRE
KENNEY &
McCAFFERTY, PC 1787
Sentry Parkway West
Building 18, Suite 410
Blue Bell, P A 19422
(215) 367-4333
Fax: (215) 367-4335

*Attorneys for Qui Tam Plaintiff*

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES *ex rel.* FENGBO ZHANG; FENGBO ZHANG, individually,<br><br>        Plaintiffs,<br><br>v.<br><br>CITIGROUP, INC.;<br>CITIBANK N.A., INC.; and<br>CITIMORTGAGE, INC.<br><br>        Defendants. | CIVIL ACTION NO. 13-cv-0377<br><br><br>FILED UNDER SEAL<br><br>JURY TRIAL DEMANDED |

**PLAINTIFF-RELATOR'S UNOPPOSED MOTION FOR LEAVE TO FILE
AMENDED COMPLAINT UNDER SEAL**

Relator, Fengbo Zhang, by and through his attorneys, file this Motion for Leave to File Amended Complaint Under Seal, and, in support thereof, respectfully states as follows:

**A.      FACTUAL BACKGROUND**

1.        Relator is Fengbo Zhang.

2.        Defendants are Citigroup, Inc., Citibank N.A., Inc., and Citimortgage, Inc. hereinafter collectively referred to as "Defendants").

3.        Relator brought a *qui tam* suit on behalf of the United States of America against Defendants alleging violations of the False Claims Act, 31 U.S.C. § 3729 *et seq.*

4.        The investigation being conducted by the United States is ongoing, and, with the consent of the Court, the government has obtained one extension of the seal

since the original filing of the case in January, 2013. By Court Order, this case remains under seal presently.

**B.     ARGUMENT**

3.     Federal Rule of Civil Procedure 15(a) requires that leave to file an amended complaint be "freely given when justice so requires." This standard is readily met here. Relator seeks to file the Amended Complaint to plead more fully and clearly the claims that have been at issue in the Complaint since this action was commenced in January, 2013, and to name an additional party.

4.     The Supreme Court of the United States determined that "[i]n the absence of . . . undue delay, bad faith or dilatory motive . . . undue prejudice . . . futility of amendment, etc., the leave sought should . . . be 'freely given.'" *Foman v. Davis,* 371 U.S. 178. 182 (1962).

5.     Defendants shall suffer no prejudice from the filing of the Amended Complaint as the case remains under seal, litigation has yet to commence and, to Relator's knowledge, the Complaint has not yet been disclosed to the Defendants.

6.     Accordingly, granting leave to file the Amended Complaint is consistent with Fed.R.Civ.P. 15(a)(2).

7.     The Relator's proposed Amended Complaint is attached hereto as Exhibit "A."

8.     Undersigned counsel certifies that they have discussed the filing of this Amended Complaint with Assistant United States Attorney Jeffrey Powell and that the Government has no objection to its filing. Relator is excused from consultation with the Defendants, or their counsel, because this case is under seal.

WHEREFORE, Relator respectfully requests this Honorable Court enter the proposed Order and grant leave to file the proposed Amended Complaint.

Respectfully Submitted,

KENNEY & McCAFFERTY, P.C.


BRIAN P. KENNEY
M. TAVENNER SHEPHERD DEMING
NY Bar No.: 5032669
KATHRYN M. SCHILLING
KENNEY & McCAFFERTY, PC
1787 Sentry Parkway West
Building 18, Suite 410
Blue Bell, P A 19422
(215) 367-4333
Fax: (215) 367-4335

*Attorneys for Qui Tam Plaintiff*

Dated: September 24, 2013

## IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **UNITED STATES *ex rel.* FENGBO ZHANG; FENGBO ZHANG, individually,** | |
| | **CIVIL ACTION NO. 13-cv-0377** |
| **Plaintiffs,** | |
| | **FILED UNDER SEAL** |
| **v.** | |
| | **JURY TRIAL DEMANDED** |
| **CITIGROUP, INC.; CITIBANK N.A., INC.; and CITIMORTGAGE, INC.** | |
| **Defendants.** | |

## PROPOSED ORDER

AND NOW, upon consideration of Relator's Unopposed Motion for Leave to File **Amended Complaint Under Seal,**

It is hereby **ORDERED, ADJUDGED AND DECREED that the Motion for** Leave of Court to File the Amended Complaint is GRANTED.

It is **FURTHER ORDERED that this Order, the Amended Complaint, and** all other **documents filed in** the above-captioned case shall be filed and maintained under **seal until further Order** of **this Court and shall not be served on Defendants until the Court so Orders.**

BY THE COURT:

_____
HONORABLE VICTOR MARRERO
UNITED STATES DISTRICT JUDGE

# EXHIBIT

# "A"

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* [UNDER SEAL], <br><br> Plaintiff, <br><br> v. <br><br> [UNDER SEAL], <br><br> Defendants. | CIVIL ACTION NO. 13-cv-0377 <br><br><br> FILED UNDER SEAL <br><br> JURY TRIAL DEMANDED |

## AMENDED COMPLAINT

FILED IN CAMERA AND UNDER SEAL
PURSUANT TO 31 U.S.C.§§ 3729 et seq.

PLEASE DO NOT PLACE ON PACER

BRIAN P. KENNEY, ESQUIRE
M.TAVENNER SHEPHERD DEMING, ESQUIRE
NY Bar No.: 5032669
KATHRYN M. SCHILLING, ESQUIRE
KENNEY & McCAFFERTY, PC 1787
Sentry Parkway West
Building 18, Suite 410
Blue Bell, P A 19422
(215) 367-4333
Fax: (215) 367-4335

*Attorneys for Qui Tam Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **UNITED STATES** *ex rel.* **FENGBO ZHANG; FENGBO ZHANG,** individually,<br><br>    **Plaintiffs,**<br><br><br>**v.**<br><br>**CITIGROUP, INC.;**<br>**CITIBANK N.A., INC.; and**<br>**CITIMORTGAGE, INC.**<br>    **Defendants.** | **CIVIL ACTION NO. 13-cv-0377**<br><br><br><br>**FILED UNDER SEAL**<br><br><br>**JURY TRIAL DEMANDED** |

### AMENDED QUI TAM COMPLAINT

Plaintiff-Relator FENGBO ZHANG ("Relator"), by and through his undersigned attorneys, KENNEY & McCAFFERTY, P.C., on behalf of the United States of America, and individually, on his own behalf, alleges as follows:

### INTRODUCTION

1.      This is an action to recover damages and civil penalties on behalf of the United States of America in connection with false claims presented by Defendants to (a) wrongfully obtain money from the United States; and (b) wrongfully use false records and statements to conceal or avoid obligations to pay money back to the United States. This action arises under the provisions of 31 U.S.C. §§3729, *et seq.*

2.      Relator, on behalf of the United States, seeks to recover treble damages and penalties under the False Claims Act, 31 U.S.C. §§3729 *et seq.*, civil penalties under the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), 12 U.S.C.

§1833a, and common law damages arising from fraud on the United States Department of Housing and Urban Development in connection with Defendant CitiMortgage, Inc.'s submission of false claims to the United States.

3.     This suit is not based on a prior public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, lawsuit or investigation; in a Government Accountability Office or Auditor General's report, hearing, audit, investigation; in the news media; or in any other location as the term "publicly disclosed" is defined in 31 U.S.C. §3730.

4.     In the alternative, to the extent there has been a public disclosure unknown to Relator, he is an original source under the aforementioned federal statute.[1]  As more fully set forth herein, Relator gained direct, independent, non-public knowledge of the information on which the allegations herein are based during his employment.  He witnessed the mortgage fraud alleged firsthand, and can confirm that these loans were defective when sold to the United States Government.

5.     Relator voluntarily disclosed his knowledge of Defendants' unlawful conduct and fraudulent claims to the United States before filing the instant action.

6.     In accordance with 31 U.S.C. §3730(b)(2), this Amended Complaint is filed *under seal* and will remain under seal, and will not be served on Defendants, until the Court so orders.

7.     Relator previously served upon the United States a copy of the original Complaint and a written disclosure summarizing the known material evidence and information in the

---

[1] In March 2010, Congress enacted the Patient Protection and Affordable Care Act ("PPACA"), Pub. L. 111-148, § 10104(j)(2), 124 Stat. 119 (2010), which contained amendments to FCA's definition of an "original source" set forth in 31 U.S.C. §30730(e)(4)(A).  To the extent § 30730(e)(4)(A) as amended by PPACA to be retroactive, or otherwise applicable to this action, and to the extent that there has been a public disclosure unknown to Plaintiffs, Plaintiffs meet the definition of an original source as that term was defined in the FCA as amended by the PPACA.

possession of Relator related to the original Complaint, pursuant to 31 U.S.C. §3730(b)(2) and Fed.R.Civ.P. 4(i).

8.     Relator shall serve upon the United States a copy of this Amended Complaint.

9.     Relator hereby incorporates by reference his Relator Statement, and Supplemental Relator Statement with all exhibits.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction pursuant to 31 U.S.C. §3730(a) and 28 U.S.C. §1331.

11.     Venue is proper in this judicial district pursuant to 31 U.S.C. §3732(a) and 28 U.S.C. §§1391(b)(1), (b)(3) and (c) because the Defendant can be found and transacts business in this judicial district.

## PARTIES

12.     The real party in interest to the FCA *Qui Tam* claims herein is the United States of America. Accordingly, at this time, Relator is pursuing his cause of action on behalf of the United States on the FCA *Qui Tam* claims set forth herein. *See, e.g.,* 31 U.S.C. §3730(b)(1).

13.     Relator is an individual domiciled in New Jersey.

14.     Relator Zhang is a Senior Vice President and Lending Consultant in CitiMortgage's Retail Lending Group. He has been employed at CitiMortgage since 2003.

15.     Relator Zhang was nominated for inclusion in Citi's President's Club during the years 2004-2007. The President's Club is Citi's highest honor. In addition, Relator Zhang received Citi's CitiStar award for being the company's top performer in 2008 and 2009. CitiStar is Citibank's highest honor.

16.     Relator was also invited to work with Citi's policy making team from 2004 to 2008. In that role, he worked with Citi's Policy Team, Jim Verhoff, Citi's Chief underwriter,

and Fannie Mae, to create the Citimortage Express program and the American Home Owner Program (AHOP). This was Citigroup's first NRA (Non-Resident Alien) Program, for which a pilot program was begun in New York. Relator, along with Mr. Verhoff, was approved by Fannie Mae to complete the first NRA loan, and the program then was expanded nationwide.

17.    Relator Zhang received a Masters Degree in Economics from Oita University of Japan, a Ph.D. from Kyoto University of Japan, and was a visiting scholar at Harvard University. Relator Zhang also conducted research at the National Bureau of Economic Research.

18.    Relator Zhang has more than twenty (20) years of experience in the financial/lending business as a loan officer, Chief Financial Analyst and Senior Manager in some of the world's top banks.

19.    Relator Zhang has written more than ten books on finance and economics, and has been regularly interviewed by the media on the topics of finance and economics.

20.    Relator Zhang is fluent in Chinese, Japanese, and English.

21.    Defendant CitiMortgage, Inc. ("Citi") is a New York corporation with a principal place of business in New York, New York.

22.    Defendant Citibank N.A., Inc. is a Delaware corporation with a principal place of business in New York, New York.

23.    Defendant CitiGroup, Inc. is a corporation organized under the laws of the State of Delaware and has its principal office in New York City. It maintains an office in O'Fallon, Missouri, at 1000 Technology Drive, O'Fallon, MO 63368.

24.    In February, 2012, Citi entered into a Settlement Agreement with the U.S. Government in connection with *U.S. ex rel. Hunt v. Citigroup Inc., et al,* U.S. District Court, Southern District of New York, No. 11-05473, wherein it, *inter alia,* "admit[ted],

acknowledge[d], and accept[ed] responsibility" for, *inter alia,* its failure to comply with HUD-FHA requirements with respect to certain loans.

## CIVIL STATUTES TO COMBAT MORTGAGE FRAUD

25.     The False Claims Act provides liability for any person (1) who knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;" or (ii) who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. §§3729(a)(1)(A)-(B).  The False Claims Act further provides that any person who violates the Act: "is liable to the United States Government for a civil penalty of not less than [$5,500] and not more than [$11,000] . . . , plus 3 times the amount of damages which the Government sustains because of the act of that person . . ." 31 U.S.C. §3729(a); *see* 28 C.F.R. §85.3(a)(9).

26.     FIRREA was enacted in 1989 to reform the federal banking system.  FIRREA authorizes civil enforcement of enumerated criminal predicate offenses – as established by a preponderance of the evidence – that affect financial institutions and certain government agencies. *See* 12 U.S.C. §1833a(e).

27.     First, 18 U.S.C. §1006 prohibits any person who is "connected in any capacity with [HUD]," from "mak[ing] any false entry in any book, report or statement of or to [HUD]" with the "intent to defraud [HUD] . . . or any other body politic . . . or to . . . deceive any officer, auditor, examiner, or agent of [HUD] . . . or of [a] department or agency of the United States."

28.     Second, 18 U.S.C. §1014 prohibits any person from "knowingly mak[ing] any false statement or report, or willingly overvalue any land, property or security, for the purpose of influencing in any way the action of [FHA]." *Id.*

29.     FIRREA provides that the United States may recover civil penalties of up to $1 million per violation, or, for a continuing violation, up to $1 million per day or $5 million, whichever is less.  12 U.S.C. §1833a(b)(1)-(2).  The statute further provides that the penalty can exceed these limits to permit the United States to recover the amount of any gain to the person committing the violation, or the amount of the loss to a person other than the violator stemming from such conduct, up to the amount of the gain or loss.  18 U.S.C. §1833a(b)(3).

30.     In 2009, Congress passed the Fraud Enforcement Recovery Act ("FERA"), an act to improve the enforcement of mortgage fraud, securities fraud, commodities fraud, financial institution fraud, and other frauds related to Federal assistance and relief programs, for the recovery of funds lost to these frauds, and for other purposes.

31.     On May 20, 2009, FERA was signed into law.

32.     FERA broadened the definition of a financial institution for the purposes of Federal criminal law to include mortgage lending businesses, which are defined as organizations which finance or refinance any debt secured by an interest in real estate, including private mortgage companies and any subsidiaries of such organizations, and whose activities affect interstate or foreign commerce.  18 U.S.C. §1014.

33.     FERA also extends the prohibition against making false statements in a mortgage application to employees and agents of a mortgage lending business.

34.     FERA adds this language —as well as "any person or entity that makes in whole or in part a federally related mortgage loan as defined in section 3 of the Real Estate Settlement Procedures Act of 1974"—to the definition of "financial institution" in 18 U.S.C. §20.  18 U.S.C. §1014.

35.     The crime of major fraud against the United States (18 U.S.C. §1031), which

previously only covered fraud in government procurement and contracts and services, was amended by FERA to include a wider range of government involvement, including grants under the American Recovery and Reinvestment Act of 2009, transactions made under the Troubled Assets Relief Program, and "any other form of Federal assistance."

36.     FERA also defined "proceeds" as any property derived from or obtained or retained, directly or indirectly, through some form of unlawful activity, including the gross receipts of such activity.

37.     Additionally, FERA expands the grounds for liability under the False Claims Act, 31 U.S.C. §§3729–3733.  It does so by clarifying that the False Claims Act covers false claims for government money or property: (1) whether or not the claim was presented to a government employee or official; (2) whether or not the government has custody of the money or property; and (3) whether or not the person or entity specifically intended to defraud the government.

38.     FERA accomplishes the above by amending the grounds for liability and altering (and adding) key definitions to the statute.

39.     FERA revised "claim" in the False Claims Act to include "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property." *See* 31 U.S.C. §3729.  This definition of "claim" includes any request or demand presented to the United States or "made to a contractor, grantee, or other recipient" if "the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest" and the United States provides or reimburses any portion of the money or property.  FERA §4(b)(2)(A)(ii).  The statute's definition of "claim" makes clear that the False Claims Act covers false records or claims made

to the government or to contractors or other recipients of federal funds.

40.     After the amendments, the False Claims Act may be enforced against any person or entity that "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."

41.     Thus, FERA expressly applies to "claims" made to Freddie Mac and Fannie Mae.

42.     Further, the new definition of "material" includes statements or records "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." *See* 31 U.S.C. §3729.

## GOVERNMENT SPONSORED ENTERPRISES (GSEs)

43.     Fannie Mae and Freddie Mac are government-sponsored enterprises ("GSEs") chartered by Congress with a mission to provide liquidity, stability, and affordability to the United States housing and mortgage markets.  As part of this mission, Fannie Mae and Freddie Mac purchase single-family residential mortgages from lenders.  One of these lenders is Citi.

44.     When the lender contracts to sell mortgages to Fannie Mae that it conveys to an MBS trust under the terms of Fannie Mae's MBS program, it delivers to the lender mortgage pass-through certificates representing interests in the mortgages; these pass-through certificates are in payment of the purchase price for the mortgages.

45.     The GSEs' single-family mortgage business primarily acquires loans through one of two channels:  (i) the lender (or flow) channel, which obtains loans from lenders on a going-forward basis pursuant to agreements to purchase loans prior to their origination; and (ii) the investor (or bulk) channel, which acquires groups of loans that have already been originated based on certain data about the loans that the GSEs review prior to purchase.

46.     When the GSEs purchase these mortgages, they require that the mortgages be of a certain quality.

47.     In order to ensure that loans were made at an appropriate risk level, and thereby minimize the possibility of financial harm, Fannie Mae established and enforced mandatory underwriting standards, lending criteria, and verification and due diligence procedures, pursuant to which Citi made certain representations and warranties about the quality of the loans.

48.     Fannie Mae underwriting guidelines are the fundamental rules that spell out the terms and conditions under which Fannie Mae purchases bundled single-family mortgage loans from lenders. The guidelines clearly elaborate the routine obligations that lenders must observe in order to secure and maintain eligibility as Fannie Mae-approved bundled mortgage sellers.

49.     Lenders must comply with Fannie Mae's current underwriting guidelines when screening borrowers. Similarly, borrowers must comply with these guidelines for Fannie Mae-approved lenders to approve applications for mortgage loans.

50.     Lenders are compelled to subscribe to Fannie Mae's guidelines as a condition for their bundled loans to be accepted in the Fannie Mae mortgage purchase program. Fannie Mae has summarized the core provisions of the current underwriting guidelines in the Fannie Mae Single Family Selling Guide.   The selling guide outlines the procedures that a seller must follow to be granted a Fannie Mae-seller approval and the regulations for conducting regular selling activities once approved.

51.     The underwriting guidelines for Fannie Mae primarily function as the industry standards for mortgage lending and borrowing transactions.

52.     Fannie Mae's underwriting guidelines also assess the eligibility criteria that lenders employ when examining and prequalifying their borrowers. Income, employment history, credit rating, loan-to-value ratio, debt-to-income ratio, and the net worth of borrowers are some of the key parameters that are examined by Fannie Mae underwriting guidelines. A

borrower must demonstrate good standings in all these parameters to be eligible in the loan bundling program.

53.    The GSEs rely on representations and warranties from the lenders that their loans comply in all respects with the standards outlined in the GSE selling guides and lender sales contracts, which set forth underwriting, documentation, quality control, and self-reporting requirements.

54.    The GSE standards and guidelines are used to assess the creditworthiness of prospective borrowers on all mortgages expected to be purchased by Fannie Mae, and mandated the use of specific residential mortgage loan application forms.  These forms are known as Fannie Mae "1003 Forms" and are used industry-wide.

55.    Citi utilizes, *inter alia,* Fannie Mae's Desktop Underwriter (DU), which is an automated system used by lenders to assess mortgage risk and make informed credit decisions. It enables the tailoring of specific loan terms based on an individual borrower's risk profile.

56.    Fannie Mae's DU contains "Underwriter Findings," which provide, *inter alia,* that "This loan is also subject to all other lender specified conditions and must comply with all applicable federal, state, and local laws and regulations."  Thus, if the loan fails to meet any of the lender's conditions, or violates laws and regulations, it is not eligible for sale to Fannie Mae.

### FHA INSURANCE PROGRAM

57.    Section 203(b) of the National Housing Act, as amended, 12 U.S.C. §§1707, *et seq.*, at §1709(b), authorizes HUD to insure lenders against losses on mortgage loans made to buyers of single-family homes.  This is commonly referred to as Federal Housing Administration ("FHA") mortgage insurance.  The FHA program is designed to help low and moderate income families become homeowners by lowering or eliminating altogether certain costs associated with mortgage loans and by providing protection to lenders.

58.     Under this mortgage insurance program, if a homeowner fails to make payments on the mortgage loan and the mortgage holder forecloses on the property, HUD will pay the balance of the loan (together with interest due and other costs) to the mortgage holder, and assume ownership and possession of the property.   HUD then incurs additional costs and expenses for the management, maintenance, rehabilitation, and marketing of the property until resold.

59.     In the vast majority of FHA-backed loans, FHA itself does not review each FHA-backed loan application prior to loan issuance. Rather, under the Direct Endorsement program, the lender determines whether the property and borrower are eligible pursuant to HUD's requirements.

60.     The Federal Housing Authority (FHA) is the largest insurer of residential mortgages in the world.

### SUMMARY OF CITI'S MORTGAGE FRAUD

61.     As part of the mortgage loan application process, prospective buyers are asked to provide information concerning income, assets, employment, and residence history, in addition to other information relevant to determining the creditworthiness of the loan applicant.

62.     Fannie Mae and HUD require that Citi verify, and independently and accurately record, information provided by loan applicants so as to ensure quality loans.

63.     Various Citi employees, including without limitation, loan officers, loan processors, underwriters, credit risk managers, operations managers, and various management personnel, have participated and continue to participate in a systematic and pervasive mortgage fraud scheme by repeatedly falsifying loan application documents so that unqualified borrowers

are able to obtain mortgages. These defective mortgages are then sold to GSEs, including Fannie Mae.

64.    Citi routinely originated loans that failed to comply with its own and the GSE guidelines.

65.    Moreover, even after February 2012, these defective mortgages were also improperly certified regarding the loans' level of risk for insurance purposes to the FHA.

66.    Because loan officers were paid on commission basis, they were incentivized to issue as many loans as possible. Loan processors and underwriters were similarly incentivized by bonuses paid based on the number of loans closed.

67.    As a result, applicable guidelines were ignored and disregarded in pursuit of high volume and, thus, high commissions.

68.    Management was aware of the violations, but in some instances chose to turn a blind eye to them, and in other instances endorsed and even encouraged the fraud because it ultimately benefited Citi's bottom line. The managers themselves also benefited because they received payment based on their team's closed loans.

69.    Because Relator has been a vocal opponent of this fraud, Citi has retaliated against him, as described more fully below.

## FACTUAL BACKGROUND

70.    Relator works in Citi's Retail Lending Group.

71.    Since beginning his employment at Citi in 2003, Relator Zhang's duties have encompassed all aspects of mortgage origination, including: Marketing (advertising, seminars, community activities, and introducing products to customers); Application (interviewing customers, collecting and reviewing information for qualified applications); Decision (working

with underwriter and borrower regarding issues including, but not limited to, appraisal, credit, employment, income, assets, and analysis; loan approval; and declination and withdraw decisions); Closing (working with operations, closing attorney and borrower for a smooth loan closing); and Post-Closing (working with auditor, investigators, and customer service on any issues regarding mortgage loans; reviewing loans sold to GSEs and serviced by Citi).

72.     Relator began working for Citi in 2003 at Citi's Park Avenue office.  Relator now works at Citi's Chatham Square or "Mott Street" location.

73.     Since his employment began, Relator has been, and continues to be, privy to disturbing details concerning Citi's failure to comply with its own, as well as the GSEs', policies and procedures regarding loan quality.

74.     Moreover, Relator is aware that defective mortgages are being fraudulently sold to the United States Government.

75.     Likewise, through his employment at Citi from 2003 through the present, Relator has witnessed Citi engage in a regular practice of reckless origination and underwriting that has resulted in mortgages of poor quality being certified for insurance through the FHA.

76.     Relator Zhang has been aware of ongoing violations by both the Sales staff (i.e., loan officers) and the Operations staff (i.e., the underwriters and loan processors) since approximately 2003.

77.     Relator Zhang has been addressing these violations with various management personnel unofficially since that time and has been officially reporting violations to Citi management since 2010, continuing through the present.

78.    Citi management has repeatedly ignored these reports and warnings from Relator, and/or has condoned and even endorsed the conduct Relator has brought to their attention, as detailed in this Amended Complaint.

79.    Until July 15, 2013, Relator reported to Mr. Bruce Nohe, Citi's Senior Lending Manager.  Relator now reports to Mr. Gary Tamboer, Senior Lending Manager based in Fort Lee, NJ.

80.    Mr. Nohe reported to Mr. Jeff Arestivo, Citi's Eastern Head of Mortgage Lending.

81.    Ms. Ping Dang is Citi's FC300 Branch Manager.

82.    Citi also has a Compliance Group to whom Relator reported various issues beginning in July, 2011.

83.    Despite Relator's repeated warnings to Citi management regarding the defects in loan quality, however, management has failed to take effective action to address the seriously deficient loan originations and underwriting issues that continue to plague Citi's Retail Lending Group.

84.    Citi's loans are rife with violations of Citi's representations and its own underwriting guidelines, as well as GSE guidelines, including without limitation, relating to (a) income and employment verification; (b) the requirement that sales be independent from operations; (c) standards regarding appraisals and occupancy; and (d) offering reduced rates on ineligible loans.

85.    The mortgage fraud witnessed and reported by Relator, including sample loans, is described below.

## CITI'S SYSTEMATICALLY DEFECTIVE LOANS

**A.      Citi Fails to Verify Borrowers' Employment And Income**

86.      As part of the mortgage loan application process, Citi must verify a borrower's employment.   Fannie Mae requires that lenders verify employment income for all borrowers whose income is used to qualify for a mortgage loan.

87.      There are two (2) different forms of verification of employment:   verbal and written.  A verbal verification of employment (VOE) is always used to verify employment and is used in every loan.    A Written VOE (WVOE) is used to verify a borrower's income, and is used when a borrower cannot provide a paystub or a W2.   If a borrower can provide a paystub or a W2, then there is no need for a WVOE.

88.      If the VOE is not obtained prior to delivery, the loan is ineligible for sale to Fannie Mae.

89.      Citi has an independent VOE team.   The VOE team is part of the Operations Team, but works separately from the loan processors.   Citi's VOE team is centralized in Missouri.  According to Citi's policy, Citi's VOE team handles the verbal VOE on all loans. According to Citi's guidelines, the VOE team is strictly separated from Sales, and is not permitted to communicate with the loan officer or the borrower.

90.      However, the independent VOE team's duties have been and continue to be routinely usurped by the loan processors.   Specifically, many processors have handled the VOEs themselves in a variety of ways in contravention of this policy, as described herein.

91.      For example, Relator is aware of many instances in which the VOE team could not verify the borrower's income, but the assigned loan processor closed the loan anyway.

92.      Relator is aware of various violations by Citi employees involving the VOE process, including without limitation, the following:   (1) Citi employees complete the WVOEs

themselves rather than following the Fannie Mae guidelines, which require that the employer complete the written form; (2) Citi loan officers routinely usurp the VOE team's duties to independently verify employment; and (3) and loans are repeatedly closed without employment having been verified.

93.     By way of example only, Relator documented the first fifty (50) loans that closed on September 28, 2012. Of these, thirty-one (31) loans, or 62%, were not handled by the VOE team. Rather, the loan processors improperly handled the VOE themselves and closed the loans without properly verifying the borrowers' income.

### 1.     *Citi Staff Improperly Completed WVOE Forms On Their Own*

94.     Fannie Mae guidelines require that a written VOE be used to verify income and employment if a borrower cannot provide a paystub or W2. If a written VOE is used to verify income, it must contain the following information:    year-to-date earnings and prior year's earnings.

95.     If a written VOE is used, Fannie Mae guidelines provide that the lender may use Fannie Mae's Request for Verification of Employment (Form 1005 or Form 1005(S)) to document income for a salaried or commissioned borrower.

96.     Critically, Fannie Mae guidelines provide that the WVOE must be faxed or mailed to/from the lender directly to/from the borrower's employer.    It may not be hand delivered by the borrower.  The VOE must be completed, signed and dated by the owner, partner, or a Human Resource representative, along with the date and phone number.

97.     Fannie Mae guidelines provide that neither the borrower nor a Citi employee may complete the WVOE form.

98. However, Citi routinely deviated from VOE policy, including, *inter alia*, by Citi staff completing Fannie Mae VOE forms themselves and by bypassing the requirement that VOE forms be faxed and/or mailed to the borrower's employer for completion.

99. Relator Zhang routinely emailed the underwriters and loan processors to advise them that the WVOEs could not be filled out by loan officers. However, Citi underwriters and loan processors routinely asked loan officers to complete WVOEs.

100. Specific examples of such emails occurred on March 29, 2012, for Loan #1122981635; on March 28, 2012, for Loan #1123003083; on April 1, 2012, for Loan #1122969721; on September 28, 2012, for Loan #1123284048; and on December 17, 2012, for Loan #1123345866.

101. Moreover, FC300 Branch Manager, Ms. Dang, routinely asked Relator to help borrowers complete the WVOE forms. Relator refused.

102. Relator also refused to complete the WVOEs and always resisted pressure from the Operations staff to deviate from the guideline mandating that WVOEs be completed by the employer.

103. Management disliked the fact that Relator refused to complete the WVOE, but Relator continued to resist, and also directed his sales assistant, Jenny Chen, to never complete a WVOE.

104. Relator Zhang reported issues relating to VOE violations to management many times. Specifically, on one occasion, Relator called and emailed his manager, Mr. Nohe, on August 27, 2012 regarding VOE fraud issues and requested a meeting. At the meeting, Relator reported Citi's VOE violations, provided supporting documents, including his emails to Operation detailing violations, and requested action.

105.   Yet, Mr. Nohe refused to take any action.

### 2.   *Loan Officers Usurp Role of the VOE Team*

106.   Pursuant to the Citi Underwriting Manual, loan processors are not permitted to exclusively handle the VOE process, as doing so violates the requirement that Sales and Operations remain independent, as further discussed *infra.*

107.   Notwithstanding its own policies, Citi allows loan processors to complete the entire VVOE process, including its approval and the clearing of the condition, all of which is performed without underwriter review and approval, even though the responsibility of clearing conditions is to be handled by the underwriter assigned to the loan.

108.   One common example of such usurpation concerns the method by which Citi acquires an employer's phone number. According to Relator, the VOE team relies on third-party vendors, TALX and The Work Number®, to research an employer's phone number, in compliance with Fannie Mae policy. However, when the VOE team is unable to successfully obtain the number, often times the loan processor assigned to the matter will simply use the telephone number provided by the borrower, in violation of Fannie Mae guidelines.

109.   By allowing a loan processor to complete and clear the VOE condition, without underwriter review, there is no way to confirm that a borrower's employment was actually verified.

110.   Accordingly, without the required system of checks and balances, the process opens itself up to the inevitable possibility that bad loans – those which are provided to individuals who would not otherwise qualify because their employment could not be verified – are approved.

111.    According to Relator, this inevitability became a reality. As can be seen below, particularly with Loans #1122574385, #1122580665, #1123080513, #1123024645, Citi approved the loans, in connection with which processors had not only usurped the responsibilities of the VOE team in verifying employment, but had also failed to follow Fannie Mae guidelines in relying on third-party vendors to provide employer's contact information.

112.    Relator also notes that having an independent VOE team, thereby ensuring that system of checks and balances, is particularly key when dealing with the following types of loans: Fannie Mae Refi Plus, Freddie Mac Relief Refi. Fannie Mae HAR, and FHA Streamline Refinance, etc. According to Relator, because GSE programs are approved based on VVOE only, no other income, assets, or employment documents are required to be verified. Thus, VVOE is the only critical condition for loan approval.

113.    Nevertheless, Relator claims that loan processors routinely allow loans to close without verifying the employment of borrowers.

114.    Regardless of whether employment has been successfully verified, the assigned processor posts a "completed" note in the LPM system, thus indicating in the system that a VOE has been successfully completed.

### 3.    *Citi Routinely Closed Loans Without Verifying Employment*

115.    Fannie Mae guidelines provide that a loan may not close until the lender verifies employment income for all borrowers whose income is used to qualify for the mortgage loan.

116.    However, as evidenced by the following loans, there were many instances in which employment was not verified but the loan closed anyway:

117.    The following loans are examples of loans exhibiting VOE violations:

<u>Fannie Mae Loans</u>

a. **Loan #1122574385**: Elmhurst, NY; Fannie Mae Refi Plus, closed on 6/27/2011. According to Relator, this loan was closed without the borrower's employment being properly verified. As evident by a note posted in LPM on June 3, 2011, the VOE team was unable validate the employment information provided by the borrower.

More specifically, the underwriter assigned to the loan, Robert Carey, posted a note indicating that verbal VOE cannot be completed because there was not a "documentable phone listing." When the bank was finally able to obtain a valid phone number – in this case, the borrower provided his boss' alleged cell phone number, which was used in violation of Fannie Mae guidelines – the employer was unable to confirm that the borrower had worked for him as long as borrower had indicated on his application. Specifically, the individual who answered the cell phone confirmed that the borrower had worked for him for approximately a year and a half. On his application, however, the borrower claimed that he had worked for the employer for three (3) years. Moreover, Citi's notes indicate that the employer itself filed for incorporation only a year and a half earlier.

According to the loan notes, the loan processor then asked the loan officer to input the borrower's previous employment information, which happened to involve a very different line of work – a Chinese restaurant as opposed to a fashion company – such that the borrower could meet the two (2) year employment history requirement. Thereafter, the following information in the Form 1003 was changed: current employment and employer, which was changed to a Chinese restaurant. No verification was provided for this change. More importantly, there is no indication that Citi was able to verify the borrower's previous employment to satisfy that requirement. The loan officer also added assets without verifying them.

Nevertheless, a request for a VOE exception was made, and inexplicably approved by the Risk Manager and rushed to close. In this case, the loan officer and senior management violated Fannie Mae requirements for employment, assets, and income verification.

b. **Loan# 1122580665**: Brooklyn NY, Fannie Mae Refi Plus, closed on 7/2011. Notes posted on June 23, 2011, make clear that Citi could not verify the employment information provided by borrowers because one employer could not be located and the other was unable to verify employment. The co-borrower stated in the application that he worked for current company for two and a half (2.5) years. However, the employment verification team could not verify the information, so the loan should have been declined. The loan processor, Huimin Ponchart, also attempted to verify a co-borrower's employment but was unable to do so because she could not find the employer's phone number. The loan officer then worked with Operations, and changed the employer's name and previous employer in order to create a two-year work history. Notwithstanding the changes, however, VOE still could not be completed. Accordingly, the VOE team posted a note stating "Do not schedule closing until the employment has been verified."

Nevertheless, despite the failed attempts to verify employment, the Loan Processing Team Leader, Heather King, requested that the VOE be rushed for completion, as "[w]e are ready to schedule this loan to close otherwise."

Following that note, Heather LaRoche, a Citi Risk Manager, directed that the number listed by the co-borrower on the loan application must be used to verify employment, in violation of Fannie Mae guidelines. In compliance with the directive, the loan processor contacted the employer and confirmed employment with someone claiming to be a manager at the company, which reportedly did not have a Human Resources or payroll department. Ultimately, the loan

was closed, despite violations of Citi and Fannie Mae guidelines by the loan officer, underwriter, Operation Team Leader, and Risk Manager.

c. **Loan #1122847617**: Cucamonga, CA; Fannie Mae Refi Plus, closed on 9/24/2012. Loan #1122847617 was closed prior to verification of the borrower's employment by the VOE team, and violated Fannie Mae HARP VOE procedures.

Listed on the application were a borrower and a co-borrower. The borrower indicated that he earned income through Social Security and Pension. Per Fannie Mae HAR VOE procedures, the borrower's Social Security Income and co-borrower's pension income needed to be verified. According to Relator, the underwriter failed to verify those sources of income in closing the loan. The VOE team ordered the VOE, but before it could be completed, the loan processor scheduled closing, then posted "Completed" for borrower, and "retired" for Co-borrower without verifying employment. After closing, the VOE team continued to try to verify borrower's employment, but was unable to do so.

d. **Loan #1123080513**: Port Jefferson Station, NY, closed on 6/29/12. Fannie Mae Refi Plus. Given the questionable employment information and the VOE team's inability to verify employment, Loan #1123080513 should not have been closed.

Both borrowers listed on their loan application that they worked at the same Chinese restaurant, in the same position, earning the same salary, and for the same duration. The loan processor posted notes that she had completed the VOE, and scheduled closing. The VVOE form completed by the processor indicates that the employer's phone number was obtained using Google, yet Relator avers that no Google search sheet can be found in the CitiWorks system.

e. **Loan #1123045587**: San Jose, CA; Fannie Mae DU loan, closed on 9/26/2012. After the VOE Team processed ten (10) times over the course of forty (40) days, it still could not

verify the borrower's employment, so a standard note was posted stating, "Do not schedule closing until the employment has been verified," pursuant to the VOE policy.   The loan processor was emailed.  Notwithstanding this note, the loan processor scheduled closing for the next day in violation of the policy.

  f.  **Loan #1123062208**: Brooklyn, NY, Fannie Mae loan, closed 7/9/12.  On April 26, 2012, the loan officer already arranged WVOE with employer in detail.  On June 1, 2012, the underwriter assigned to the loan posted a note at 2:37 p.m. indicating that the WVOE was received but was incomplete and, as such, needed to be "re-conditioned accordingly."  Nineteen (19) minutes later, at 2:56 p.m., the loan processor posted a note stating that the WVOE had been updated.  The underwriter confirmed that she had received the completed WVOE at 3:45 p.m.  Thus, in less than twenty (20) minutes, the loan processor had supposedly sent the WVOE, along with a request to complete, to the employer's Human Resources department, and had it returned and promptly forwarded to the underwriter.

  Additionally, Relator notes that the same loan processor, which notably had been switched from Xia Chin to Huimin Ponchart, whom the loan officer uses often and trusts, completed the VVOE rather than the VOE team, further evidencing the usurpation of the VOE team's responsibilities.

  g.  **Loan #1122886424**: Elmhurst, NY, closed 2/21/12. The loan processor posted notes stating that VOE had been completed, and closing was scheduled.  Later, the VOE team still could not verify employment.  Nevertheless, the loan ultimately closed.

  h.  **Loan #1123069236**: Brooklyn, NY, closed 7/23/12.  According to Relator, Loan #1123069236 was approved despite employment having not been properly verified.  In the loan application, the co-borrower's stated income is much higher than that which was listed by the

borrower. The LPM notes indicate that the VOE for the co-borrower was ordered, through Talx, on July 11, 2012. The next day, a note was posted stating that "Talx needs additional information / documentation to process VOE." In other words, the VOE team could not verify the employment of either the borrower or the co-borrower. The VOE team then posted a note stating, "Escalation to underwriter may be required if employment cannot be verified. Do not schedule closing until the employment has been verified." Ultimately, the VOE team's note was disregarded, as the loan was closed on July 16, 2012, passed audit, and was closed off on July 23, 2012, at which point VOE had still not been completed.

     i. **Loan #1123049005:** Rodeo, CA, closed 9/23/12. This Fannie Mae Loan was closed despite numerous issues relating to VOE. The loan application listed a borrower and co-borrower. The borrower added a second job that was not listed on the initial application, though no duration of employment was specified. According to Relator, the addition of the income from this second job was necessary for the loan's approval, as the first job alone did not provide sufficient income to exceed the necessary income ratio for approval. However, Relator adds that the income from the second job was not eligible to be used in the income ratio calculation because the job itself did not begin until August 13, 2012, as indicated in the WVOE, over four (4) months after the initial loan application had been submitted. Consequently, the borrower lacked employment that was "consistent" and "uninterrupted," as required by Fannie Mae guidelines and Citi's underwriting manual.

     Even assuming the second job could have been used to qualify the borrower, no VVOE was performed to confirm the employment.

     Pursuant to Citi and Fannie Mae guidelines, a WVOE was also needed to verify average income from this second job. According to Relator, the WVOE indicated that the

borrower's probability for continued employment was "N/A." Typically, a 100% probability or an excellent probability are required for loan approval.

Additionally, the borrower provided an invalid paystub to verify his second job. According to Relator, the underwriter verified employment using a single paystub, which indicated the same start and end dates of employment. As a result, the paystub failed to cover a pay period of at least thirty (30) days, as required by Citi's Underwriting Manual. Not to mention, at the time of verification, the paystub was already more than ninety (90) days old and, thus, according to Relator, was no longer acceptable.

Finally, the second borrower listed on the application was employed at his place of business for less than two (2) years from the date of the application. In the initial application, the co-borrower stated that he had worked for his current employer for seven (7) years. However, the WVOE indicated that the co-borrower's date of hire was August 23, 2010, far less than the duration stated on the application. Similarly, the employer's name on the paystub provided by the co-borrower differed from the name provided on the loan application, in violation of Fannie Mae policy.

j. **Loan #1123371017**: Forest Hills, NY, closed on or around 1/30/13. In violation of Citi and Fannie Mae guidelines, Citi approved and closed the loan despite an improper WVOE. On January 12, 2013, the underwriter, Darlene McCoy indicated that there are "two paystubs with 2 different pay amounts" and requested a full VOE. The processor emailed the borrower regarding those conditions and also contacted the borrower's HR department for a WVOE. Eventually, the underwriter received the WVOE, and found a discrepancy in the figures provided in the WVOE by the employer and the amounts in the W2 as provided by the borrower. Such a discrepancy is an indication of potential fraud and must be investigated. Thus, the

underwriter requested an explanation from the employer. Ultimately, no explanation letter was provided by the employer. Instead, according to Relator, the borrower provided a letter explaining the discrepancy. Subsequently, Jamie Wyborski, an underwriter who was not the underwriter assigned to the loan, accessed the file, and "waived lox from the employer," in violation of Fannie Mae's WVOE police stating that "this form is to be transmitted directly to the lender and is not to be transmitted through the applicant or any other party."

<u>Freddie Mac Loans</u>

k. **Loan #1123065369**: Elmhurst, NY, closed 7/31/12, Freddie Mac Relief Refi. The loan officer violated policy by assigning the loan to an underwriter and processor she selected, as opposed to the registration team.

Additionally, the borrower's employment history was "self-employed" and for less than two (2) years, in violation of GSE guidelines. The previous employer was listed as just the borrower's name, not a company.

Finally, the VOE was not done by the VOE team, but rather by the loan processor. According to Relator, there is no verification information in system. Because it is a Freddie Mac Relief Refi Program, it needs to be verified by a CPA or regulatory agency, along with the phone listing or business license.

l. **Loan # 1123024645**: Houston, TX; Freddie Mac Relief Refi, closed on 9/21/2012. Rather than the VOE team doing its job, the loan processor handled the VOE and, in doing so, completed it without key information. The borrower's VOE form was completed by the loan processor, who indicated that she obtained the employer's telephone number from the LPM system. According to Relator, obtaining the number from the LPM system simply means

that the number was provided by the borrower. Accordingly, the borrower's application does not qualify as a third party, as required by Fannie Mae.

Moreover, even though the co-borrower listed a salary income on the loan application, a note was posted indicating that the co-borrower was unemployed. As such, his salary should have been listed as zero. Yet, the borrower's employment information, as well as his salary, were listed on the 1003 application, thereby producing a contrived income ratio that allowed the loan to qualify.

Despite the questions surrounding the verification of both borrowers' employment, the loan was improperly closed on September 21, 2012.

m. **Loan #1123047520**: Boynton Beach, FL; Freddie Mac Relief Refi, closed on 9/21/2012. The VOE Team processed four (4) times over eighteen (18) days and still could not verify borrower's employment. On September 10, 2012, at 4:47 pm, a note was posted stating, "The employer on this request requires a signed authorization by their employee before they will release the verification information." On the next morning, September 11, 2012, at 9:52 am, the loan processor posted a note stating, "VOE completed," without any further information.

<u>FHA Loan</u>

n. **Loan #1123140962**: Pompano Beach, FL, closed on 8/8/12. This FHA loan was closed despite a note in the LPM indicating that the VOE had not been completed. On July 23, 2012, the loan processor, Katie Anderson, posted a note claiming that VVOE had been completed. Two (2) days later, however, the VOE team ordered a VOE through Talx. It was then determined that Talx needed "additional information / documentation to process the VOE." On July 31, 2012, the VOE team noted that the VOE had not been completed because the

additional information that had been requested was not provided.  Nevertheless, the loan was closed on August 8, 2012, without any indication that the VOE had been successfully completed.

**B.    Citi Fails to Require That Sales Staff Be Independent from Operations Staff**

118.    GSE and Citi guidelines require the Sales staff to be independent from the Operations staff in order to avoid improper influence on the credit decision.

119.    This separation is critical for risk management purposes.

120.    Pursuant to Citi's own internal policies, the Sales staff (i.e., loan officers) must avoid excessive visits to the loan processors and underwriters, as well as any type of gift-giving in an attempt to influence the credit decision.

121.    Citi traditionally followed these laws and regulations.  However, since 2009, new management has disregarded those laws and regulations, and the violations have expanded.

122.    Since then, Citi management has encouraged the Sales staff to have close relationships with the Operations staff, resulting in a lack of independence.

123.    Examples of the erosion of independence between the groups includes the continued disregard of the role of the Registration Team as well as the Food for Success program.

**1.   Role of Registration Team Disregarded**

124.    Standard procedure at Citi is for the Registration Team to independently review and randomly assign a loan to a loan processor through the registration process.

125.    However, according to Relator, this independent review and random assignment is routinely disregarded, as Citi loan officers routinely usurp the responsibility of the Registration Team.

126.    According to Relator, the loan assignment process works as follows:

(a) After receiving the application, the loan officer has up to seventy-four (74) hours to complete the application;

(b) Once the application has been completed, the loan officer must then release the loan to the Registration Team by choosing the "Reassign/Change Loan Number" option in LPM;

(c) The loan officer then selects the Registration Team for his or her respective sales group. The loan is then reviewed by the Registration Team, which typically takes about one week or more; and

(d) Finally, the Registration Team *randomly* assigns the loan to a loan processor and an underwriter.

127.    Notwithstanding this process, loan officers often ignore the role of the Registration Team, and select processors and underwriters with whom they are familiar – either before or after the Registration Team had an opportunity to randomly assign the loan.

128.    Often times, processors and underwriters are assigned to loans within a few days of the loan being opened. According to Relator, such a short turn-around time indicates that the standard protocol is not being followed. Instead, he claims that, in such instances, loan officers were assigning loans to processors prior to the Registration Team's review, often to processors of their liking in order to push questionable loans through to closing.

129.    Relator asserts that loan officers also disregard assignments by the Registration Team and, instead, choose their own processors and underwriters.

130.    Relator claims that by circumventing the random assignment procedure, loan officers ensure that a questionable loan will bypass checkpoints that it otherwise would not have in an effort to increase the number of closed loans.

131.    Exacerbating the problem, hand-selected loan processors fill out the VOE rather than sending it to the borrower's employer, and complete a verbal VOE rather than sending through to VOE team as required.  From the operations side, the hand-selected loan processors change information on appraisal, employment, income, assets, etc in order for the loan officers' loans to get approved.

132.    Relator became increasingly troubled by this lack of independence between the Sales and Operations staff, and the continuous violation of procedures and protocols in an effort to drive up volume and commissions.

133.    Thus, on August 8, 2010, Relator Zhang emailed senior managers and National Operation Director Dale Korte about the consistent problem of loan officers hand-selecting loan underwriters, and underwriters approving loans immediately without going through necessary procedures and review.

134.    Management did not respond to Relator's email.

135.    After getting no response to his email, Relator checked Citi's "loan pipelines" and found that a multitude of Citi's loans have the same issues, *i.e.*, underwriters were approving loans within minutes of receiving them without any registration, operation, checking and review procedures, and without the necessary supporting documents.

136.    Following this discovery, Relator prepared a document containing more than 200 suspect loans in which loan officers had selected underwriters by themselves, and approximately fifty (50) loans with Registration Team's "Already Assigned" notes.

137.    This "Already Assigned" note meant that the standard protocol – the loan is initially independently reviewed by the Registration Team, which then randomly assigns the loan to the underwriter and processor – was not being followed.  Instead, a loan officer was

immediately assigning the loan to a specific, hand-selected underwriter with whom he or she had a close relationship and, presumably, over whom the loan officer could influence the credit decision.

138.    On August 18, 2010, the Registration team found that numerous loans had been "already assigned," and emailed related parties to inquire about the issue. Five (5) days later, on August 23, 2010, the Registration Team posted a note regarding this issue.

139.    Examples of these include the following loans:    1122185149, 1122182150, 1122183233, 1122183531, 1122182150, 112266643, 1122279189, 1122281538, 1122265681, 1122200831, 1122201109, 1122199165, 1122199165, 1122195402, 1122195530, 1122193852, 1122191407, 1122188171, 1122183531, 1122182150, 1122179414, 1122180365, 1122180365, 1122165876, 1122162688, 1122164247, 1122157352, 1122153287, 1122141274, 1122124455, 1122267794, 1122257987, 1122255252, 1122250122, 1122250823, 1122248149, 1122246355, 1122247226, 1122239430, 1122239593, 1122232248, 1122229655, 1122222054, 1122219780, 1122220148,    1122218714,    1122213287,    1122206061,    1122202937,    1122200450,    and 1122204020.

140.    These violations are still continuing, and include, *inter alia,* Loan #1123088022, a Fannie Mae HARS loan. Here, the loan officer applied for the loan on May 16, 2012, at 12:31 p.m., assigned the loan to the underwriter he selected, and the underwriter approved the loan on the same day at 12:33 p.m., within just two (2) minutes.

141.    Similarly, on Loan #1123247729, the loan officer applied for the loan on August 28, 2012, and assigned the loan to the underwriter and processor she selected on the same day.

142.    Additional examples of loans with the same issue after September 2012 include: 1123088285, 1123088540, 1123089475, 1123086716, 1123087596, 1123065369, 1123141128,

1123245684, 1123246819, 1123244491, 1123244676, 1123242686, 1123243254, 1123243311, 1123243482, 1123250920, 1123290442,1123286174, 1123287947, 1123284074, 1123279285, 1123315693, 1123316909, 1123313681, 1123313758, 1123314279, 1123314633, 1123314737, 1123315489, 1123310499, 1123310787, 1123310977, 1123311028, 1123311048, 1123311214, 1123311652, 1123311880, 1123311996, 1123312237, 1123312371.

143.    More recently, Relator pulled a Citibank Pipeline Report from February 28, 2013, and analyzed the first forty (40) loans in the report. The loans, all of which are closed, have been sold to Fannie Mae or Freddie Mac.

144.    Of the loans, only one (1) (2.5%) was handled by an underwriter or processor who was randomly assigned by the Registration Team.

145.    The other thirty-nine (39) loans (97.5%) illustrate the usurpation of the Registration Team's responsibilities, ultimately demonstrating a lack of independence between the Sales and Operations staff. Three (3) loans (7.5%) were "already assigned" to an underwriter or processor before Registration Team review. Conversely, the Registration Team's review was disregarded on thirty (30) loans (75%), in connection with which randomly assigned underwriters and/or processors were changed to those chosen by the loan officer. Finally, the pipeline report indicates that five (5) loans (12.5%) involved no Registration Team review.

## 2.  *Visits between Sales and Operations*

146.    Additionally, Relator avers that Citi management encourages fraternization between the Sales and Operations teams.

147.    According to Relator, management arranges for the Sales teams to visit loan processors and underwriters in Missouri, where Sales teams are to provide entertainment,

including luxury hotel accommodations, meals, shows, sporting events, gifts, sightseeing tours, etc., for their respective Operations staff.

148.    On one occasion, Bruce Nohe requested that Relator visit the Operations staff in Missouri to maintain a good relationship, just as Relator's fellow Sales Team members had already done. Relator declined the request, citing the illegality behind the visit and its goal.

149.    According to Relator, at a meeting on May 15, 2012, at approximately 2:00 p.m., in Mr. Nohe's office, Mr. Nohe asked Relator to visit Missouri and offer to provide entertainment to the Operations staff, so as to maintain a good relationship with them, like all other loan officers had done. Relator objected to the directive, stating that Sales cannot have close relationship with Operations, as such interaction would violate Citi's policy requiring independence and separation between the teams. Notably, seven (7) years earlier, Loan Officer Kevin Cheung, who had previously won the CitiStar award, invited members of the Operations staff to lunch, for which the officer and his supervisor, Kennedy Mykoo, were terminated. Notwithstanding that instance, Mr. Nohe reassured Relator that, unlike seven (7) years ago, Citi can take such actions because it is no longer under the watchful eye of the government; in other words, because Citi already settled its suit with the government,[2] it would not be sued again. Nonetheless, Relator refused the directive, and thereafter witnessed the volume of his closed loans plummet – from 201 units ($59.7 million) in 2011 to 140 units ($38.9 million) in 2012.

150.    Relator also avers that Mr. Arestivo invited members of Operations to visit New York, where they were provided with lavish accommodations.

---

[2] Relator believes that Mr. Nohe was referencing the United States' lawsuit against Citi involving Sherry Hunt.

### 3. *Food for Success Program*

151.    In addition to the team trips, Sales also sought to curry favor with the Operations staff by providing them with lunch on a regular basis, pursuant to its "Food for Success" program.

152.    In approximately July, 2011, Mr. Nohe officially introduced the bank's "Food for Success" campaign, which is ongoing.

153.    Pursuant to this campaign, management requested that the Sales team (i.e., loan officers) buy lunch for the Operations Team (i.e., underwriters and loan processors and operation manager/team leader) each week. The objective of the campaign was to curry favor with the underwriters in an effort to convince them to approve more loans for the loan officers.

154.    Accordingly, each loan officer was to provide lunch for the Operations team for one week.

155.    Ms. Heather King, the underwriting Team Lead based in Ann Arbor, MI, issued a daily "Food for Success" report to show how many loans were approved to close by the underwriters, and if they reached the goals set by management. These reports incentivized the Sales team to continue to provide the lunches, as they resulted in more loans being approved.

156.    Ann Arbor, MI is the location of the Citimortgage Operation Center.

157.    This email report was sent by Ms. King to the Sales and Operations teams detailing daily results.

158.    The reports listed the daily "results" for each loan processor by units, dollars, and totals.

159.    This campaign is a direct violation of the prohibition on the separation between sales/loan officers and underwriters, as well as the prohibition on loan officers providing gifts to loan processors/underwriters, to obtain favorable loan decisions.

160.    Because Relator told Mr. Nohe that he strongly disagreed with the campaign and because management knew Relator's history of making complaints regarding the improper relationship between the Sales and the Operations teams, management generally refrained from asking Relator to participate in the campaign.

161.    However, as recently as January 2013, the Operations Manager emailed Relator to request Relator to pay for lunch for the Operations Team.  Mr. Nohe's assistant also called Relator to make the request.

162.    Relator stated that loan officers cannot incentivize underwriters to approve loans, and refused to pay.

163.    At Mr. Nohe's staff meeting on January 11, 2013, four (4) other loan officers asked Mr. Nohe to stop the Food for Success program, citing legal problems with it and stating that it is inappropriate for Sales to pay underwriters to approve loans.  Mr. Nohe stated that the program must continue so that the underwriters can approve the loans, and Sales can meet its goals.  Mr. Nohe further stated that anyone who did not want to participate should let him know and he would pay their share.

164.    On that same day, Mr. Nohe sent an email to the Manhattan South Sales staff reassuring them that Mr. Arestivo had confirmed that the lunch program is compliant with applicable regulations.

165.    Under the "Food for Success" campaign, as of the end of July 2012, 14,092 units, totaling $4.95 billion new loans were booked.

166.     Approved loans increased sharply under this campaign, which began in 2011 and expanded in 2012.

167.     In fact, as of the end of October, 2012, under this campaign, 20,736 units, totaling $7.44 billion, new loans were booked.

168.     Notably, because Relator disagreed with the program and did not participate, his volume of closing loans decreased during the same time period.

169.     Although Citi has made no formal statements regarding its termination, the "Food for Success" program appears to have ended as of approximately late May, 2013.

**C.     Citi Violated Appraisal and Occupancy Guidelines**

170.     In order to approve otherwise invalid loans, Citi employees routinely violated applicable Fannie Mae and Citi guidelines regarding appraisals and occupancy.

171.     Citi attempted to, *inter alia,* (1) improperly influence appraisals and (2) routinely approved loans with quality rates notwithstanding material misrepresentations regarding occupancy and appraisal issues.

172.     Citi employees routinely violated these guidelines regarding appraisals by, *inter alia,* directly contacting the appraisal companies, re-ordering second appraisals with a different appraisal company after an initial denial, and even changing forms.

173.     Relator is aware of certain circumstances in which management knew of and approved such conduct.

174.     For example, on Loan #1122710122, Citi's Collateral Risk Management (CRM) Department immediately stopped the appraisal after the appraisal company indicated that the applicable property was an illegal 4-unit property.  GSE and Citi policies prohibit an appraisal for an illegal property.  The loan was declined on November 20, 2011, by the underwriter, who

stated there were no counseling options. Following this declination, it should have been impossible to re-order an appraisal and/or get an approval, based on Citi's guidelines. An illegal property is unacceptable collateral (Citi underwriting manual, Section 5603, page 1) and the loan would be ineligible for sale to a GSE.

175.    However, on January 14, 2012, loan officer Rachel Sze did, in fact, re-apply for a loan, with new Loan #1122937850 (Bayside, New York; Loan type: Fannie Mae Refi Plus, Closing Date: 4/24/2012). This time, she ordered an appraisal, the second appraisal on this property in connection with the application, using a different appraisal company. As expected, the appraisal company reported the same illegal issue to CRM, which then stopped the appraisal. Yet, Ms. Sze then improperly contacted the appraisal company directly, and requested that it not only continue with the appraisal, but that it also do so on an expedited basis.

176.    This type of contact between the loan officer and the appraisal company is strictly prohibited.

177.    Before the appraisal came back, the Head of CRM, the same individual who first stopped appraisal for this property, posted a note: "The subject has an illegal 3rd unit, but this is common and typical." Furthermore, the appraisal report indicated the same illegal issue. The same Underwriter reviewed the appraisal report once again, and sent an e-mail to the Risk Manager requesting a declination. Having received a response from the Risk Manager, the underwriter declined the property, citing the same illegal property issue as in the first declination, as evidenced by his posted comments.

178.    At this point, the loan officer should not have been able to approve the loan, even with the approval from management. Nevertheless, at the request of Ms. Sze, CRM and the Risk Manager requested that the appraisal company change its appraisal report. The appraisal

company ultimately complied, updating the report several times until it was eventually accepted by Citi, which then instructed the appraisal report to be released.

179.    When the underwriter, Jamie Wyborski, approved the loan, she posted a self-serving note: "CRM reviewed the appraisal and said is acceptable w/revision . . . CRM said appraisal is acceptable."

180.    Documents further reveal that FC300 Branch Manager, Ms. Dang requested Mr. Nohe to push this loan through to top management.

181.    Many top management officials, including Ms. Dang, Mr. Nohe, and Mr. Arestivo, and potentially more individuals, were directly involved in and endorsed this fraudulent conduct.  Ms. Dang emailed Mr. Nohe to "escalate" the mortgage for approval and closing.  Documents in this example clearly show that the loan officer, the underwriter, the Senior Sales Manager, the Head of Collateral Risk Management, a Risk Manager, and a Citibank Branch Manager all intentionally violated, *inter alia,* the laws, regulations, and Fannie Mae's policies concerning "Appraisal Independence" and "No modification to appraisal report," among others, in approving this loan.

182.    Approving a loan on an illegal, valueless property means the loan already lost collateral and will certainly become a bad loan.  As such, the property cannot even sell at foreclosure.

183.    Moreover, Citi loan officers routinely approved, and even offered quality rates on loans for borrowers who made material misrepresentations concerning the relevant properties.

184.    A borrower who intentionally misrepresents occupancy type of the subject property gains the advantage of better rates and terms.

185.    It is common at Citi to approve loans based on undisclosed properties and false statements regarding occupancy.

186.    False statements regarding occupancy are considered major violations and result in a fraudulent loan.

187.    Regardless of these nondisclosures and false statements, the loans are not only approved, but Citi also offers borrowers the best rate on these properties as investment properties, despite the borrowers misrepresenting the properties as being their primary residences.

188.    These types of nondisclosures could trigger a repurchase of the loan by a GSE.

189.    The following are examples of this type of fraudulent conduct:

a.     **Loan #1122981956**:  The property is located in Yonkers, NY; Fannie Mae Refi Plus; Loan Officer: Philip Robles; Underwriter: Debra Miller; Loan Processor: Sandy Marcum. The borrower applied for the loan as a primary residence.  This loan closed on June 4, 2012.

Citi's Fraud Prevention and Investigation indicated that the "borrower owns one or more properties with higher value or size than the declared owner occupied property."  In light of this information, the loan should have been declined due to an undisclosed property.   The underwriter requested a residency clarification from the borrower several times, but the borrower disregarded these requests.  Finally, the loan processor asked the loan officer to change the information in the application form (Form 1003), which is to be filled out by the borrower.  On April 11, 2012, the loan processor, Sandy Marcum, again noted that she "still needs" residency clarification and the application needs to be corrected.  Specifically, the occupancy appears to have been incorrect.

On April 20, 2012, the notes show that Philip Robles, the underwriter, updated the occupancy: "corrected to a second home." The underwriter may not change the occupancy to a second home (and thereby give the borrower a better rate). Moreover, the property should not have qualified as a second home because it was in the same area as the primary residence, as it is a violation of Fannie Mae guidelines, which preclude a second home in the same area as a borrower's primary residence.

Moreover, the VOE was not completed by the VOE team, but rather by the loan processor on May 16, 2012.

b.   **Loan #1122901564**:   A review of the LPM notes reveal the following information: the property is located in Flushing, NY; Loan type: Fannie Mae Refi Plus. This loan closed on May 8, 2012.

The appraiser noted that the current tenant converted the property from a two-bedroom to a four-bedroom. The appraiser noted a "cost to cure" of $1,000, and stated that the drywall should be removed. The LPM notes do not make any showing that the necessary improvements were made to bring the property into compliance. Rather, the underwriter disregarded the appraisal report and approved the loan with comments stating "u/w did not request anything further as from photos it appears that the only thing needed would be to remove drywall erected."

This loan should be compared with Loan #11223018982, which was a loan that Relator worked on and had a similar issue to the wall issue in Loan #1122901564. All conditions were satisfied except removing a wall. The Operations staff discussed with underwriting many times, and two (2) underwriters confirmed that the "illegal" wall could not remain. Thus, Relator withdrew the loan.

c.   **Loan #1122903111**:  The LPM notes reveal that this property is located in Brooklyn, NY, and is a Fannie Mae Refi Plus.  The appraisal report indicated an illegal property – a four-family home had been converted to a three-family home without the requisite permits. As a result, the loan should have been declined.  Notwithstanding this issue, the notes state that the appraisal company was asked to comment if non-permitted conversions are common and typical in this market.  The appraisal company stated that it was unable to determine if other properties were changed without permits.  Nevertheless, the underwriter, Jamie Wyborski, still approved the loan to close, and the loan closed on February 23, 2012.

d.   **Loan #1122948879/1123054483**:  Location:  Brooklyn, NY; Loan type: Citi Standard; Closing Date: July 24, 2012; sold to Fannie Mae on September 1, 2012.  This loan demonstrates that the Citibank branch manager, the mortgage sales manager and director, and the Operation staff are not independent and separate, as required, but instead are working together and violating Citi's appraisal policy.

The first loan on the property, Loan #1122948879, was applied by Relator.  The borrower had insisted that it was a one-family house, but the appraisal company and all other sources verified that it was a two-family house.  Based on the appraisal report, Relator refused to change it to a one-family house.  Because it was a two-family house, the borrower had to pay one (1) point, pursuant to federal policy.

Then, the Citibank Branch Manager and Senior Sales Manager arranged for the borrower to cancel the loan.  They asked Loan Officer Rachel Sze to re-submit the loan, which was assigned Loan #1123054483, and to re-order a second appraisal using a different appraisal company, which they selected.  The new appraisal report changed the house from a two-family to one-family house and, in doing so, failed to correct the one point ($3,640).

Also, Citibank Branch Manager Ping Dang asked Senior Sales Manager Bruce Nohe to refund the appraisal fee for the first loan, but this was request was flatly rejected by Sean Sweeney. Mr. Sweeney strongly objected based on the Bank's policy that does not allow the appraisal fee to be refunded for a withdrawn loan. Not satisfied, Mr. Nohe invoked support from Jeff Arestivo, Head of Eastern Region, by including Mr. Arestivo in the email chain. Subsequently, Mr. Sweeney approved the refund. Relator then emailed Mr. Nohe and pointed out the violations.

e.    **Loan #1122904929**: The LPM notes indicate that this property is located in Brooklyn, NY, and is a Fannie Mae DU, FHA-insured loan. This loan closed on July 24, 2012. The property was approved as a primary residence despite multiple problems.

When the borrower applied, the system showed an "Address Discrepancy." Moreover, a "Welcome Package" to the address was retuned as undeliverable. Further, Schedule E of the borrower's tax return listed an additional property owned by the borrower.

The underwriter disregarded the undisclosed properties and occupancy issues, and approved the loan as a primary residence with the best rate. Before closing, a back-up underwriter reviewed the loan, and indicated that the credit report showed two (2) additional addresses. This issue had not been indicated by the first underwriter. The borrower stated that the first address is his current residence, and edited the Form 1003.

Further, the loan officer asked the underwriter to waive a W2 condition on the basis that it was in the possession of the accountant. However, this is not an acceptable reason for waiving this condition.

In spite of multiple issues, the loan was approved as a primary residence with the best rate. As a result, the borrower and co-borrower now have four (4) primary homes in same area, despite regulations only permitting one (1) such home.

f.   **Loan #1123026195**: This property is located in Norwich, Connecticut, and is a Citiquick loan that was sold to Fannie Mae. The loan closed on June 14, 2012. A Fraud Flag indicated that the borrower had an undisclosed property. The loan officer claimed that the property belonged to borrower's fiancé, but the application listed the borrower as married. In response, the borrower provided a letter of explanation, claiming it belonged to her sister-in-law. However, research verified that the house belonged to the borrower's husband and her sister-in-law, meaning that it belongs in the borrower's household. Nevertheless, the loan was approved. The borrower was working and living with her husband in New York, and the subject property was in Connecticut. Although it clearly should have been an investment property and thus subject to a higher interest rate, it was approved as a second home.

g.   **Loan #1123030073**: This property is located in Brooklyn NY and is a standard loan, sold to Fannie Mae. This loan closed on July 13, 2012. The loan officer applied for the loan, which was assigned Loan #1122752354. The underwriter changed the property to make it an investment property, because the borrower cannot have a second primary residence in the same Brooklyn borough of New York City, pursuant to Fannie Mae guidelines. Because there was no response from the borrower, the loan was declined on January 11, 2012. At that point, pursuant to Fannie Mae policy, the underwriter's decision should have been final.

Two (2) months later, though, on March 19, 2012, the same loan officer re-submitted the loan, with a new loan number (Loan #1123030073), again listing the property as a second home. A new underwriter declined the loan due to occupancy issues, with the counseling option

to change the property to an investment property because borrowers are not permitted to have a second primary residence in the same city, pursuant to Fannie Mae guidelines.

However, the loan officer received approval from the Risk Manager, the underwriter's supervisor, to approve the loan. The underwriter thus changed the decision back to a second home with the same rate as the primary residence, in violation of Fannie Mae policy.

Also, the Registration Team assigned the loan to loan processor Xia Chin, but the loan officer changed the loan processor to Huimin Ponchart, who completed the VOE and scheduled the closing. In this case, the Risk Manager and the loan officer effectively forced the underwriter to violate Fannie Mae's second home policy.

h.   **Loan #1123181472/1123358551**: This property is located at 307 7th St. 4R, Brooklyn, NY 11215. This is a Fannie Mae DU Agency Jumbo loan. Fannie Mae ID #1095780059. This loan closed on February 11, 2013. The borrower was Samantha Sherman, Citigroup VP of Marketing. Loan officer: Matthew Ohrvall; Underwriter: Brian Randolph; Risk Manager: Mark Bono; Processor: Maryam Safari.

This loan involves two (2) applications for a loan on a condominium. This condominium project was declined on July 13, 2012. A review of the LPM notes reveal that Citi declined the loan on the condominium project because Citi already had three (3) loans on the project and the proposed loan would be the fourth, bringing Citi's exposure to greater than 30%. Thus, Citi declined "due to ineligible terms and conditions and condo project not approved."

Because declined projects are ineligible for mortgages, Citi credit policy requires getting full review and approval by the Project Decision Team before taking a loan application on one of these projects. However, in this case, the loan officer still applied for Loan

#1123181472 on July 19, 2012, before getting project approval. The loan was subsequently declined by the underwriter on August 14, 2012, in light of the fact that it was a declined project.

However, the loan officer again applied for the loan under Loan #1123358551 on November 2, 2012, notwithstanding the fact that the project was listed on Citi's Project List as "Declined." Notably, the Fannie Mae DU findings also indicated "Declined Condominiums, PUDs and Co-ops are ineligible." The loan officer attempted to work with the project team to overcome the issue of Citi's exposure being greater than 30%, but the same conditions existed as on the previously declined loan. There is no documentation in the file to show how the issue was resolved. Rather, the notes show that the budget on the condominium "no longer has adequate funds allocated to replacement reserves." Although this should have been a basis for the denial of the loan, the Risk Manager, Mark Bono, inexplicably stepped in and approved the loan to close.

In addition the above violations, Citi staff, including the loan processor, repeatedly contacted the appraisal company to request an increased appraisal value. The completed appraisal report, reviewed by Citi, indicated a property value of $705,000. The loan amount was $580,000, which meant that the LTV (Loan to Value) was 82.3% (>80%). Thus, the loan needed mortgage insurance. The borrower requested that the appraisal value be increased, so Citi staff worked with the appraisal company and the appraisal report was changed so that PMI would not be an issue. The property value increased from $705,000 to $715,000. The borrower continued to request a further increase in value and the processor contacted the appraisal company again, but the second request was rejected by the appraisal company.

i.   **Loan #1122050658/1122108318**: This property is located at 3350 Pine Neck Road, Southold, NY 11971. The borrower is Dominick Milone. This is a Fannie Mae DU loan,

Fannie Mae ID #1018384995. The loan officer on this loan is Allison Kampel Singer. This loan closed on September 29, 2010.

There are both appraisal and occupancy violations affecting this loan. The loan officer applied for the first loan, which was assigned Loan #1122050658. Due to a low appraisal value, the loan was declined by the underwriter on May 25, 2010. Beth Glombow, who Relator believes to be a former Risk Manager at Citi, emailed the underwriter twice requesting approval for the loan and stating that the "loan exceeds 'ltv guidelines for agency jumbo program[.]'" The underwriter did not provide the requested approval and, as a result, the loan was declined on June 15, 2010.

Shortly thereafter, the loan officer re-submitted the loan and was assigned a new loan number: Loan #1122108318. The loan officer improperly locked the rate for forty-five (45) days on June 23, 2010, in violation of Citi loan resubmit rules for the 30-day waiting period. These resubmit rules require a 30-day waiting periods, including that "resubmitted loan must remain in a floating status until that 30 day period is over." Thus, the loan officer improperly locked the rate within the 30-day waiting period.

Additionally, the borrower applied for the loan on the subject property as a primary residence. However, Citi's Fraud Prevention & Investigation team indicated that the borrower had an undisclosed primary residence, and concluded that the loan cannot be approved ("cannot have two primary residences."). In response, the underwriter changed the property to a second home. However, the subject property is in the same New York area, and the borrower already had another second home listed on the application.

Thus, based on Fannie Mae guidelines, the subject property should have been deemed an investment property, which would have received a higher rate, or the application simply should have been declined due to an undisclosed property.

The underwriter then discovered that the subject property was reported as investment property in borrower's tax return. So, the underwriter stated that: "In reviewing the borrowers tax returns, the subject property appears as a rental on the returns. The returns reflect the borrower has not occupied the subject in the previous 12 months. This loan no longer qualifies as it was submitted, therefore this loan is being declined." Thus, the underwriter had to decline the application with no option for counteroffers.

Rather than decline the loan, however, the loan officer met with the borrower on September 7, 2010, after which the Risk Manager emailed the underwriter for approval. The underwriter could not approve it, so the Risk Manager made the decision to approve the loan. An appraisal report was received on September 20, 2010, but the underwriter did not review it. The Risk Manager emailed the underwriter and advised him to "proceed as 2nd home," without any explanation as to the previously identified issues. Thus, the underwriter's decision, which was based on credit lending policy and Fannie Mae guidelines, was overturned.

There are also VVOE issues with this loan. The borrower's employer's telephone number is indicated from the WVOE. It is not from a third party, as required. Relator also alleges that there is no WVOE in CitiWorks. For the co-borrower, the business license from the State of New York did not show her name as the owner.

Notwithstanding the various issues detailed above, the loan was closed.

j.   **Loan #1123138547/1123469430**:   Borrower: Barry Kusumo, Property Address: 320 Alabama Street, #23, San Francisco, CA 94110, Fannie Mae DU loan, closed on August 10, 2012. Fannie Mae ID #1081093757.

The Registration team assigned Loan #11231338547 to Loan Processor Evan Gilb, and Underwriter Jim Pluemer, but these assignments were disregarded.   Steven Leonelli and Mohamed Hassim handled the loan for Loan Officer Kelli Hall.

Regarding the loan application, the Condo team (which is only authorized group for project decision-making) emailed all parties (Loan officer, underwriter and processor) on July 9, 2012, and informed them that the "Project was DECLINED for the following reason: "PROJECT IS AN INELIGIBLE CONDO (LIV/WORK DEED RESTRICTION)."   Further notes indicate that "Live/work condos are ineligible for limited review."   However, on July 11, 2012, the loan officer directly requested that the underwriter's supervisor, Risk Manager Tom Hufford, approve the loan, notwithstanding that members of Sales are strictly prohibited from contacting the Risk Manager.   Only the underwriter can make the decision to contact the Risk Manager.   However, just a few hours later, Tom Hufford posted comments:   "Subject qualifies for Limited Review," "Ok to proceed with process," and thus disregarded the Condo team's decision.

Accordingly, the building's Master Insurance policy, HOA statement, fully executed Condo Questionnaire, etc. were requested for project review.   No notes indicate that a Condo Questionnaire was received for review.   On July 31, 2012, the processor emailed the underwriter: "Condo on Citi's approved list?"   On the same day, an appraisal report was received and indicated "Land value, replacement cost and econ. life are missing."   These are defects and additional information that would be necessary in order to complete the appraisal report.   Yet, the next day the underwriter posted the following note: "Full Approval – CTC (Clear To Close)."

The loan closed, even though the project status has been "Declined" since August 20, 2008, and remains so presently. This is a serious violation of Project Approval Requirements in Fannie Mae DU policy, and a finding of "Declined Condominiums are ineligible" in this loan.

On January 17, 2013, five (5) months after Loan #1123138547 closed, the same loan officer, Kelli Hall, applied for another loan for Unit #3 in the same building. This loan was assigned Loan #1123469430.

The Condo Team emailed all parties (Loan officer, underwriter and processor) on January 29, 2013, and re-confirmed the project status: "Declined," "PROJECT IS AN INELIGIBLE CONDO (LIVE/WORK DEED RESTRICTION," and requested all condo documents to review the project for approval. The loan officer posted notes on February 14, 2013, at 12:18 p.m., and tried to use previous notes from Risk Manager Tom Hufford to approve the loan without project full review. Another underwriter for the Condo team also posted the following note on March 20, 2013, at 9:37 a.m.: "condo is not eligible for limited review – *condo has deed restrictions that are not approved by Fannie Mae.*"

After reviewing the documents, the Condo team informed the underwriter, loan officer, and processor: "*Condo is declined by Fannie Mae* for 'live/work' restrictions ... *the restriction is NOT an approved restriction by Fannie or Citibank.*" The underwriter of the Condo team further emailed all parties, and posted the following note on March 25, 2013, at 8:08 a.m.: "*I really do not believe that this one has any chance of getting approved by Risk.*"

However, inexplicably, Risk Manager Hufford disregarded all of this information and upheld his previous decision. On March 25, 2013, Tom Hufford noted, "ok to proceed with limited review," and therefore approved the loan without project full review. Consequently, the loan was closed. According to Relator, the project still did not get approval by the project team,

and continued in a "DECLINED" status. Citi has not yet sold this loan to Fannie Mae. However, Loan #1123138547 has already been sold to Fannie Mae.

k.   **Loan #1123248130**: Borrower: Anuradha Dhar, Property Address: 1200 Grand Street, #213, Hoboken, NJ 07030, Fannie Mae DU loan, closed on January 19, 2013. Fannie Mae ID #1087308760.

The notes show that the Registration Team assigned the loan to Processor Melissa Taylor and Underwriter Arlana Miller, but this assignment was disregarded and Lanita Douthard and Stan Turner handled the loan with Loan Officer Kevin Brunk.

This is a declined project, and the processor attempted to get documents for approving the project. On December 11, 2012, the processor noted that she still had not yet received a necessary document, entitled "Condo's questionnaire form." On the same day, the underwriter approved the loan, CTC (Clear To Close) with limited review for the project, as "Project is not on Citi Condo List."

If a unit is not on the Project List, the condo may be eligible for limited review as per Citi policy. However, this particular project was actually on Citi Condo List with a status of DECLINED and had been on the list since June 19, 2012, six (6) months prior to the date underwriter approved the loan. The reason for the decline was "LITIGATION PENDING AGAINST CONDO DEVELOPER FOR CONSTRUCTION DEFECTS." This is a key ineligible project type listed in the Fannie Mae Selling Guide and Citi policy. The loan also violated Project Approval Requirements in Fannie Mae DU policy, and the finding of "Declined Condominiums are ineligible" in this loan.

### D.       Citi Loan Officers Give Reduced Rates on Ineligible Loans

190.     According to Relator, Citi routinely offered reduced or discounted interest rates on loans that failed to meet Fannie Mae guidelines.

191.     Rate/term is the most important thing in mortgage lending business.  Interest rate is a particularly critical check point for approval on Fannie Mae loans.

192.     Offering a reduced rate on a loan that does not meet Fannie Mae guidelines can result in the loan becoming non-performing.  Any such loans sold to Fannie Mae, or insured by the FHA, will continue to post a loss for years.

193.     Based on the borrower's assets, Citi's customers are divided into categories such as: Regular, CitiGold, Preferred and Affluent customers.  CitiGold, Preferred, and Affluent customers receive special incentives, including rate reductions between 0.125% and 0.375% on their respective loans, or cash back credit, as well as an expedited approval process.  The rate reduction is calculated on a sliding scale, such that the reduction correlates with the amount of Citi assets held by the borrower.

194.     However, Citi loan officers routinely offer reduced or discounted rates on loans that were not eligible for these programs.

195.     In order to receive the special rate or credit, a borrower's assets must be verified. As specified in the conditions of approval, located in the DU Findings Report, any reduced rate requires verification of the amount of the borrower's investable assets held with Citi.

196.     Any misrepresentation regarding borrower assets is a violation of Citi policy and GSE guidelines.

197.     Citi's procedures provide as follows:

(e) Borrower states the amount of assets held with Citi on Fannie Mae Form 1003 and signs every page;

(f) The loan officer checks page 3 with important "Acknowledgment and Agreement;"

(g) When the loan officer inputs the code "Citigold .125% credit ->$250k-$750k," the loan is processed through the DU (Fannie Mae Desktop Underwriting), and the system immediately creates a condition "This interest rate requires verification of $250,000 or more investable assets with Citibank beyond any monies used to close your mortgage loan;"

(h) It is the responsibility of the underwriter to verify the assets, thus clearing the condition and approving the reduced rate;

(i) The Closing Department confirms that the loan is eligible for this reduced rate; and

(j) Finally, the Audit Team audits the file, and closes it.

198.   Failure to verify assets, thereby satisfying the "lender specified conditions," not only renders a loan ineligible for the program, but also violates Fannie Mae guidelines, which along with HUD standards and Citi internal regulations, prohibit loan officers from misrepresenting products and services.

199.   Relator estimates that 60-80% of the loans given these lower rates were not eligible to receive them, including but not limited to the following loans:

a.   **Loan #1123046111:** Waltham, MA, Fannie Mae DU loan, closed on 8/28/12. Despite indicating in his loan application that he had no assets with Citi, the borrower's interest rate was reduced by 0.125%.

The loan officer inputted the promotional code on behalf of the borrower, and offered a reduced rate of 0.125%. To qualify for the reduced rate, the borrower was listed as having between $250,000 and $750,000 in assets with the bank. Relator believes that, without the rate reduction, the borrower's income ratio (46.34%) would have violated the Fannie Mae guidelines, which required a borrower's income ratio to not exceed 45%.

The borrower had no assets maintained with Citibank, as verified by the underwriter. Moreover, the borrower's assets deposited with another bank totaled only $30,000. Nevertheless, the underwriter cleared the condition and approved the reduced rate. The Closing Department and Audit Team closed the loan.

b. **Loan #1123081050**: Larchmont, NY, Fannie Mae DU loan, closed on 9/9/2012. Although the borrower listed less than $35,000 in Citi assets, the interest rate on his loan was reduced by 0.375%. To qualify for this rate reduction, Citi would have had to verify that the borrower held more than $1,000,000 in assets with the bank. The responsible underwriter verified only $15,632.50 in Chase and $0 in Citibank. Nonetheless, the underwriter cleared the condition and approved the loan. The Closing Department and Audit Team also passed the loan to close as a Fannie Mae loan.

E. **Citi Loan Officers Classified Ineligible Loans under Its Affluent Program**

200. Similar to the reduced rate program, Citi operated a program for its wealthy customers called "Retail Bank Affluent Program," ("Affluent Program") that resulted in defective loans.

201. The Affluent Program was launched in November 2010.

202. The program was later renamed as the "Signature Program."

203. Under this program, customers with Citi assets exceeding a certain threshold were entitled to a number of benefits, chief among which was that mortgage loan applications submitted by affluent customers could not be declined by the underwriters without the permission of Citi Sales staff or Operations staff.

204. According to Relator, this type of laborious loan review would inevitably result in unqualified loans being closed due to the fact that liabilities, credit, employment and other critical factors are disregarded. Rather than have their decisions second-guessed by their superiors, underwriters were pressured into closing loans that may have been questionable or, worse, unqualified.

205. Additionally, to qualify for the "Signature Program," borrowers often misrepresented the amount of assets held with Citi on their Forms 1003.

206. The loan officer must review the assets stated before inputting the client code corresponding to the Affluent/Signature Program (i.e., "Signature $250K") into the DU. If approved, the DU indicates that "the loan is subject to all other lender specified conditions and must comply with all applicable federal, state, and local laws and regulations." Thus, being placed into the program requires verification of the amount of the borrower's assets held with Citi.

207. The responsibility to verify the assets falls on the assigned underwriter, who must do so before clearing the condition and approving the borrower's eligibility for the program.

208. Failure to verify those assets, thus satisfying the "lender specified conditions," not only renders a loan ineligible for the program, but also violates Fannie Mae guidelines, which along with HUD standards and Citi internal regulations, prohibit loan officers from misrepresenting products and services.

209.    Relator alleges that from December 2010, through December 2011, Citi closed 4,086 loans under the "Affluent Program" ("Signature Program"), totaling $2,451,127,858. According to Relator, not all of these loans qualified for the program, in violation of Citi policy and Fannie Mae guidelines.

**F.    Recently Defaulted Loan That Was Sold to Fannie Mae**

210.    It is clear that many of the defective loans sold to the GSEs will inevitably default.

211.    Loan #2004516962 represents an example of a defective loan sold to Fannie Mae that recently defaulted. Even though there were serious problems with the loan, it was ultimately approved by Citi, and subsequently sold to Fannie Mae.

212.    The subject property is located at 3719 Park Ave, Fairfield, CT 06825-1435. The property was listed for foreclosure on September 9, 2012.

213.    The original loan application (Loan #2004335300) was submitted in April 2007, requesting $291,500.

214.    However, that application was withdrawn on July 2, 2007, after paystubs, W2s, and asset documents were not supplied by the borrower.

215.    On July 3, 2007, the same loan officer responsible for the original request re-applied for the loan (Loan #2004516962), which requested $329,500. By canceling the first loan and reapplying for the same loan on the following day, the loan officer was able to not only lock in the original interest rate, but also to conceal the changes in the borrower's income and assets. Doing so, however, violated the standard "greater than 30 day waiting period" for a loan re-submission.

216.   Furthermore, under the original loan request, the borrower's income ratio was greater than the 45% requirement found in the Fannie Mae guidelines.

217.   Yet, between the time when the original loan request was withdrawn and the subsequent application was submitted, the borrower's monthly income, as stated on the loan application, increased from $4,458 to $6,250, a 40% increase.

218.   Even a 20% increase in income from a previous year is not acceptable under both Citi and GSE guidelines.

219.   More importantly, the increased income caused the borrower's income ratio to decrease to 44%, even with the increased loan request of $329,500, thereby satisfying Fannie Mae guidelines.

220.   The borrower's total assets also sharply increased from the first application to the second, while his liabilities remained consistent.  Specifically, his assets were listed at $434,248 in the original application, and $490,629.41 in the second.

221.   Those assets were never verified, in violation of Fannie Mae guidelines.

222.   Additionally, the borrower failed to provide documents required under Fannie Mae guidelines, including proof of income for more than thirty days, such as a paystub, a W2 or a standard W2.

223.   Further, the VOE was completed by the borrower himself with the loan officer's help.

224.   In the end, the applications contained various discrepancies concerning the borrower's employment, yet those discrepancies were ultimately ignored.

225.   A Fannie Mae condition also made clear that "collection and charge off accounts must be paid." However, the underwriter waived the condition, and "Rushed" the loan to close.

By doing so, the underwriter disregarded the borrower's high unpaid balance, late payments, and limited credit history, all of which were indicators of a high risk of mortgage default.

226.   Notwithstanding its numerous defects, the loan was approved and sold to Fannie Mae.

227.   Not surprisingly, the loan ultimately defaulted.

### G.   Citi Retaliates Against Relator

228.   Beginning in 2003, Relator's main office was located at 90 Park Avenue, New York, NY 10016.   At that time, Relator had many responsibilities and flourished in his job. Relator performed nationwide lending responsibilities, and also covered three (3) branches in Manhattan and three (3) branches in Flushing.  He worked in this location for six (6) years.

229.   In 2009, Citi management transferred Relator to Citibank Financial Center 300 or FC300, located at 164 Canal Street, New York, NY 10013.

230.   In December 2012, Citi management transferred Relator to Citi's "Chatham Square" or "Mott Street" location, located at 2 Mott Street, New York, NY 10013.

231.   According to Relator, both of these transfer decisions were directed by Mr. Arestivo.

232.   During his early years at Citi, Relator witnessed pervasive violations of Citi's policies and protocols, and brought them to the attention of management.  On most occasions, Citi management was responsive to Relator's complaints.

233.   Relator was named to Citi's President's Club during the years 2004-2007.  The President's Club is Citi's highest honor.

234.   Relator was also invited to work with Citi's policy making team from 2004 to 2008. In that role, he worked with Jim Verhoff, Citi's Chief Underwriter, and Fannie Mae, to

create the Citimortage Express program and the American Home Owner Program (AHOP) – Citigroup's first NRA (Non-Resident Alien) Program, for which a pilot program was begun in New York. Relator, along with Mr. Verhoff, was approved by Fannie Mae to complete the first NRA loan. The program was then expanded nationwide.

235. In addition, Relator Zhang received Citi's CitiStar award for being the company's top performer in 2008 and 2009. CitiStar is Citibank's highest honor.

236. Although Relator continued to witness pervasive mortgage violations in the years following 2009, in or around 2009, Citi management, led by Mr. Arestivo, began to display a different attitude when Relator raised objections regarding mortgage origination violations.

237. Specifically, Citi management became unwilling to correct the violations, and rather, appeared to endorse and even encourage the improper conduct about which Relator had been complaining.

238. Moreover, Relator sensed a growing hostility from management directed toward him.

239. From Relator's perspective, during 2009 through the present, Citi management focused solely on increasing sales and, in doing so, disregarded risk management issues.

240. As a result of Relator's opposition to Citi's fraudulent conduct, Relator has experienced direct retaliatory actions from Citi management.

### 1. *Management Declines Relator's Loans Without Explanation or Justification*

241. Although Relator always strictly followed all laws and regulations, and always received the highest quality audit scores, his loans began to be declined without explanation or justification.

242.     By way of example, Loan #1122951620 was a loan that Relator submitted and the underwriter approved.  A second level underwriter also approved it.  When Relator sent the loan to the Risk Manager for his signature, the Risk Manager requested additional documentation. The underwriter then emailed Relator on February 15, 2012, to tell him that additional information had been requested from the borrower and that "if we do not receive the requested information/documentation by Thursday, March 1, 2011 the loan will be withdrawn."

243.     However, on February 17, 2011, almost two (2) weeks before the deadline of March 1, 2011, Jeff Arestivo, Eastern Head of CitiMortgage Sales, informed Relator and related parties in an email that the loan had been declined.

244.     Mr. Arestivo stated that "this loan was reviewed and declined by the senior risk manager."

245.     There is no information in the Citi system about the Senior Risk Manager's declining the loan.  In fact, only two (2) days prior to Mr. Arestivo's email, the underwriter, based on the Risk Manager's request, had already asked the borrower to get additional documentation by March 1st in order to approve the loan.

246.     Moreover, as the Eastern Head of CitiMortgage Sales, Mr. Arestivo cannot make such decisions or be involved in such decisions.  This decision is strictly within the province of underwriters.

247.     Finally, in addition to declining Relator's loans without justification, management routinely ignored and/or disregarded Relator's request for assistance with getting loans finalized and/or approved.

248.     Specifically, Relator has documentation showing that Mr. Nohe routinely deleted Relator's email requests without reading them.  These email requests were Rush requests seeking

assistance on various loan issues.  As a result, many of Relator's loans could not be processed, were declined or withdrawn, and/or led to customers complaints.

249.   In the meantime, Mr. Nohe routinely rushed requests on various loan issues from other employees, resulting in loan approvals for those employees.

250.   By way of example, on June 14, 2012, Relator sent a Rush Request to Mr. Nohe. Ten (10) days later, the loan was still not reviewed, and the processor emailed Relator asking whether the Rush had been requested.  So, Relator sent the Rush to Mr. Nohe again on June 25, 2012.  Still, no action was taken.  Then, after two (2) weeks, on July 9, 2012, Mr. Nohe deleted Relator's email without reading it.  The email reads:  "Your message was deleted without being read on Monday, July 09, 2012 10:20: 12 AM[.]"

251.   Mr. Nohe deleted many other email messages from Relator without reading them. Examples of these emails occurred on:  June 26, 2012, July 16, 2012, August 7, 2012, August 14, 2012, August 21, 2012, November 29, 2012, January 7, 2013, and February 21, 2013.  These emails all were marked "urgent" or "rush" and each was deleted without being read.

252.   Some of these emails were also sent to the assistant for the Manhattan South Sales Team, and Mr. Nohe's assistant, Ms. Johanny Carasco.

253.   On January 7, 2013, Relator sent an email to Mr. Nohe and Ms. Carrasco stating "attached please find my list.  As you can see, I didn't have any closing[s] from previous month['s] wish list."

254.   Again, because Mr. Nohe did not read the emails from Relator, he hindered Relator's ability to perform his job.

### 2. *Violations by FC300 Branch Manager Ms. Ping Dang*

255. Ms. Dang was the Branch Manager at the FC300 location, and thus had supervisory power and control over her staff.

256. Ms. Dang routinely improperly used her authority to retaliate against Relator for his complaints regarding violations and fraudulent conduct.

257. Specifically, Ms. Dang routinely attempted to divert Relator's mortgage business away from Relator to other loan officers.

258. Only Relator is officially authorized to cover Ms. Dang's branch. Thus, all mortgages referred from this branch go through the system and should be sent directly to Relator.

259. However, Ms. Dang improperly redirected customer referrals from Relator to other loan officers by using bank staff's user IDs and passwords without their authorization.

260. Ms. Dang disregarded and attempted to override the notices from Citi's system administration, stating that Relator "is the only user at this location."

261. Specifically, Relator has documentation indicating that a referral was changed in the system from him to another loan officer on November 12, 2011. When Relator confronted Ms. Dang about this, Ms. Dang blamed Ms. Wendy Cui and claimed that the problem was caused by an administrative error. However, Ms. Cui was on vacation in China from November 5, 2011, through November 20, 2011, and it would have been impossible for her to input anything into the system during that period. Moreover, when she returned from China, she confirmed with Relator that she did not input any information into the system. Thus, Ms. Cui's user ID and password were accessed without her knowledge or authorization.

262. Also, during March-April, 2011, Ms. Dang violated the FDIC and Citi mandatory 2-week vacation policy requiring that certain employees be absent for "an uninterrupted period

of no less than two weeks" by actually returning to work during the mandated absence and attempting to redirect business away from Relator.

263.    Relator believes that Ms. Dang was supported in her conduct by Mr. Arestivo.

264.    As detailed herein, Citi's retaliatory conduct has had, *inter alia,* adverse economic, physical, and emotional consequences upon Relator.

### H.    Citi Compliance Group Also Failed To Address Relator's Complaints About Ongoing Fraud

265.    Relator voiced complaints to Citi regarding Citi's violations of policy and procedure throughout his employment beginning in 2003 and continuing through the present.

266.    At various points, Relator spoke with his boss, Mr. Nohe, in person regarding his concerns and sent him emails regarding Citi's non-compliance with procedures designed to prevent mortgage fraud.  Mr. Nohe, along with any of his superiors, have yet to take any action, despite being aware of Relator's complaints and the conduct alleged.

267.    On July 5, 2011, Relator sent Mr. Nohe an email with copies to Ms. Dang, and Jane Chu, another Bank employee who had also complained about Ms. Sze's conduct, reporting Ms. Sze's' unethical/illegal conduct relating to various violations and instances of mortgage fraud.  Relator reminded Mr. Nohe that there had been many complaints regarding this type of conduct by many other individuals, and that this was an official report, meaning that it should be forwarded to Citi's Compliance Group in accordance with Citi compliance policies at that time.

268.    Rather than forward the complaint to Compliance for investigation, in accordance with Citi policy and as Relator requested, Mr. Nohe criticized Relator and responded that he would discuss Relator's concerns with Ms. Sze.

269.    Mr. Nohe copied the email to Mr. Arestivo, his boss and Ms. Sze's close ally, and Holly Antiuk of Human Resources.

270.    Ms. Cynthia Leung, another member of the Citi Retail Branch staff, also met with Mr. Nohe at or around the same time, and voiced her strong objections to Ms. Sze's policy violations.

271.    Although neither Mr. Nohe nor Mr. Arestivo did anything to quell the ongoing mortgage fraud being committed by loan officers under their direct supervision, Citi's Human Resources Group did forward Relator's July 5, 2011, email to Citi's Compliance Group.

272.    On July 15, 2011, Relator received a call from Daniel Whitehead, SVP of the Compliance Group.   During the call, Relator inquired as to the function of the Compliance Group and expressed his concerns regarding the lack of response from management regarding his views of the ongoing mortgage fraud at Citi.   Relator also stated his concerns regarding Mr. Arestivo's close relationship with Ms. Sze.

273.    Mr. Whitehead informed Relator that his boss is Citigroup's Chief Compliance Officer, who reports directly to the CEO.   He stated that all investigations are completely independent, and that anyone about whom a complaint is filed would be investigated, including management.   Mr. Whitehead then asked Relator to explain the basis for his allegation of unlawful conduct in the Sales area.

274.    Relator referenced the emails attached to his July 5, 2011 email to Mr. Nohe.   Mr. Whitehead told Relator that there were no attachments to the email.   Relator believes that Mr. Nohe deleted all the attachments to his July 7, 2011 email that documented his allegations. Nevertheless, Relator then re-sent the attachments, with additional documentation of other violations.

275.   Relator continued to work with Mr. Whitehead, including sending four (4) additional reports detailing Ms. Sze's violations that were ignored and/or condoned by Citi's senior management.

276.   On July 20, 2011, Relator sent another report to Mr. Whitehead containing many loans that violated Citi's policy by improperly offering a reduced rate to ineligible loans.  Mr. Whitehead responded on July 21, 2011, by email to thank Relator.  In a follow-up telephone conversation, Mr. Whitehead stated that he had expanded his investigation.

277.   On August 2, 2011, Citigroup issued a new notice, for "comprehensive" Control Framework.  This directive replaced the Compliance Group's function and now made the "Business Manager as the first and best line of defense, having primary responsibility for understanding and assessing key risks and the strength of controls."

278.   On August 31, 2011, Relator received an email from John Zurick from Citi's Human Resources.  When Relator called Mr. Zurick, he stated that Relator should talk with his manager, Mr. Nohe, to resolve those issues.  Relator stated his disagreement based on his understanding of the procedures, i.e., that the issues must be independently handled by the Compliance Group, and the employee must cooperate with internal Compliance Group or external investigators confidentially.  Relator stated that he understood that he was not supposed to inform the business managers, particularly because it was Relator's belief that the business managers were potential targets of the internal investigation.

279.   On September 2, 2011, Mr. Whitehead emailed Relator to thank him for helping him to identify issues.  Additionally, he asked for information regarding waiving of upfront fees for ineligible loans, which Relator provided.

280.    According to bank policy, if the fee was not received one time, the loan officer would receive a warning and would be charged to the loan officer.  A second occurrence would result in the loan officer being fired.  Despite the evidence, no corrective action has been taken.

281.    Unfortunately, since the advent of the new policy stating that the "Business Manager has primary responsibility," the Compliance Group appears to have been reduced to setting policy and education, and no longer has investigation and/or decision-making authority.

282.    Moreover, there appears to be little concern within Citi for compliance with fraud training in general.  According to a May 7, 2012 report, "there are still over 100 individuals [in Mr. Arestivo's Eastern Regional Group] who have not completed the Fraud Training course as required" after the April 30th deadline passed.

283.    On or about July 15, 2013, Mr. Nohe was abruptly terminated.  No explanation was given from Citi to Mr. Nohe's team for Mr. Nohe's sudden departure.  However, at the Manhattan South Team meeting on July 19, 2013, Relator states that Mr. Arestivo said to the team, "it's sad what has happened to Bruce, my dearest friend.  This should not have happened.  Unfortunately, it has happened."

284.    Senior lending Manager Gary Tamboer is Mr. Nohe's temporary replacement.  He sent an email to Relator Zhang's team on July 15, 2013, stating that he would be the "SLM for Manhattan Central/South effective today and until further notice."  He also referenced the "rather sudden" news of Mr. Nohe's departure.

## CLAIMS FOR RELIEF

### COUNT I
### Violations of the False Claims Act
### (31 U.S.C. §3729(a)(1) (2006), and, as amended, 31 U.S.C. §3729(a)(1)(A))

285.    Relator incorporates by reference and restates each of the preceding paragraphs as if fully forth in this paragraph.

286.    As set forth above, Defendants knowingly, or acting in deliberate ignorance and/or with reckless disregard of the truth, made false representations about the quality of their loans at the time of their sale of the loans to the GSEs, including that the loans were of investment quality and complied with the GSE selling guides and purchase contracts.

287.    Defendants' misrepresentations about loan quality were capable of influencing, and thus were material to, the GSEs' decisions about purchasing and/or pricing Defendants' loans.

288.    The GSEs have incurred losses as a result of Defendants' misrepresentations in the form of paying guarantees to third parties after the affected loans defaulted.

289.    Treasury funds have been used to purchase Defendants' loans and to reimburse the losses incurred by the GSEs as a result of paying out guarantees to third parties after guaranteed loans purchased from Defendants defaulted.

290.    Treasury funds to the GSEs were used to "advance a Government program or interest," within the meaning of 31 U.S.C. §3729(b)(2), specifically, to prevent disruptions in the availability of mortgage finance.

291.    By virtue of the acts described above, and in violation of 31 U.S.C. §3729(a)(1)(A), for each of the loans sold to the GSEs in violation of GSE requirements after the

effective date of FERA, Defendants knowingly, or acting in deliberate ignorance and/or with reckless disregard of the truth, presented a fraudulent claim for payment or approval.

292.    Pursuant to the False Claims Act, 31 U.S.C. §3729(a)(1), Defendants are liable to Relator and the United States under the treble damage and civil penalty provisions for a civil penalty of not less than $5,500 and not more than $11,000 for each of the false or fraudulent claims herein, plus three (3) times the amount of damages which the GSEs have sustained because of Defendants' actions.

## COUNT II
### Violations of the False Claims Act
### (31 U.S.C. §3729(a)(2) (2006), and, as amended, 31 U.S.C. §3729(a)(1)(B))

293.    Relator incorporates by reference and restates each of the preceding paragraphs as if fully set forth in this paragraph.

294.    As set forth above, Defendants knowingly, or acting in deliberate ignorance and/or with reckless disregard of the truth, made false representations about the quality of their loans at the time of their sale of the loans to the GSEs, including that the loans were of investment quality and complied with the GSE selling guides and purchase contracts.

295.    Defendants' misrepresentations about loan quality were capable of influencing and thus were material to the GSEs' decisions about purchasing and/or pricing Defendants' loans.

296.    The GSEs have incurred losses as a result of Defendants' misrepresentations in the form of paying guarantees to third parties after the affected loans defaulted.

297.    Treasury funds have been used to purchase Defendants' loans and to reimburse the losses incurred by the GSEs as a result of paying out guarantees to third parties after guaranteed loans purchased from Defendants defaulted.

298.    Treasury funds to the GSEs were used to "advance a Government program or interest," within the meaning of 31 U.S.C. §3729(b)(2), specifically, to prevent disruption in the availability of mortgage finance.

299.    By virtue of the acts described above, and in violation of 31 U.S.C. §3729(a)(1)(B), for each of the loans sold to the GSEs in violation of GSE requirements after the effective date of FERA, Defendants knowingly, or acting in deliberate ignorance and/or with reckless disregard of the truth, made, used, or caused to be made or used, false records and/or statements material to a false or fraudulent claim presented for payment or approval.

300.    Pursuant to the False Claims Act, 31 U.S.C. §3729(a)(1), Defendants are liable to Relator and the United States under the treble damage and civil penalty provisions for a civil penalty of not less than $5,500 and not more than $11,000 for each of the false or fraudulent claims herein, plus three (3) times the amount of damages which  the GSEs have sustained because of Defendants' actions.

## COUNT III
### Violations of the False Claims Act
### (31 U.S.C. §3729(a)(1) (2006), and, as amended, 31 U.S.C. §3729(a)(1)(A))

301.    Relator incorporates by reference and restates each of the preceding paragraphs as if fully set forth in this paragraph.

302.    As set forth above, Defendants knowingly, or acting with deliberate ignorance and/or with reckless disregard for the truth, presented and/or caused to be presented, to an officer or employee of the Government, false and fraudulent claims for payment or approval in connection with its sale to Governmental entities of bundles of fraudulently certified mortgages and Citi's endorsement of FHA-insured mortgages after February, 2012.

303.    The United States Government paid insurance claims, and incurred losses, relating to FHA insured mortgages wrongfully sold, certified, guaranteed and/or endorsed by Defendants because of Defendants' wrongful conduct.

304.    By reason of the false claims of Defendants, the United States Government suffered damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, and a civil penalty as required by law for each violation.

## COUNT IV

### Violations of the False Claims Act
### (31 U.S.C. §3729(a)(7) (2006), and, as amended, 31 U.S.C. §3729(a)(1)(G))

305.    Relator incorporates by reference and restates each of the preceding paragraphs as if fully set forth in this paragraph.

306.    As set forth above, Defendants knowingly made, used, or caused to be made or used, false records and/or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the United States.

307.    The Government paid insurance claims, and incurred losses, relating to FHA insured mortgages wrongfully sold and/or endorsed by Defendants because of Defendants' wrongful conduct.

308.    By virtue of the false records or statements made by Defendants, the Government suffered damages.

309.    Pursuant to the False Claims Act, 31 U.S.C. §3729(a)(1), Defendants are liable to Relator and the United States under the treble damage and civil penalty provisions for a civil penalty of not less than $5,500 and not more than $11,000 for each of the false or fraudulent claims herein, plus three (3) times the amount of damages which the GSEs have sustained because of Defendants' actions.

## COUNT V
### Violations of the False Claims Act
### (31 U.S.C. §3730(h))

310.    Relator incorporates by reference and restates each of the preceding paragraphs as if fully set forth in this paragraph.

311.    The False Claims Act, 31 U.S.C. 3730(h), provides as follows:

> Any employee who is *discharged, demoted,* suspended, *threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment by his or her employer* because of lawful acts done by the employee on behalf of the employee or others in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section, shall be entitled to all relief necessary to make the employee whole. Such relief shall include reinstatement with the same seniority status such employee would have had but for the discrimination, 2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees. An employee may bring an action in the appropriate district court of the United States for the relief provided in this subsection.

312.    As set forth more fully above, in violation of 31 U.S.C. §3730(h), Defendants have retaliated against Relator by demoting, harassing, and hindering his employment, as well as discriminating against him in the terms and conditions of his employment after he lawfully reported what he believed to be fraudulent conduct or wrongdoing to his superiors.

313.    Because Relator was retaliated against as a result of his lawful acts in furtherance of an action under this section, including objecting to Defendants' violations of the False Claims Act explained herein, Defendants have violated False Claims Act, §3730(h).

314.    Accordingly, Relator is entitled to all relief necessary to make him whole.

## PRAYER

WHEREFORE, Relator acting on his own behalf and on behalf of the United States demands and pray that this Court enter judgment against Defendants as follows:

a. In favor of the United States and against Defendants jointly and severally in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty of not less than $5,000 and not more than $11,000 for each violation of 31 U.S.C. § 3729 *et seq.*;

b. In favor of Relator for the maximum amount allowed as a Relator's share pursuant to 31 U.S.C. § 3730(d);

c. In favor of Relator against Defendants jointly and severally for all reasonable expenses, attorneys' fees and costs incurred by Plaintiffs pursuant to 31 U.S.C. § 3730(d); and,

d. That Relator be awarded all special damages, including, but not limited to, compensation for compensatory damages, and any other damages provided under 31 U.S.C. § 3730(h)(2);

e. That Relator be awarded all costs incurred, including reasonable attorneys' fees;

f. That Relator be granted any and all other relief set forth in the False Claims Act which was not specifically referenced above; and

g. Such other relief as this Court deems just and appropriate.

**TRIAL BY JURY**

Relator hereby demands a trial by jury as to all issues.

Respectfully,

BRIAN P. KENNEY, ESQUIRE
M.TAVENNER SHEPHERD DEMING, ESQUIRE
NY Bar No.: 5032669
KATHRYN M. SCHILLING, ESQUIRE
Kenney & McCafferty, P.C.
1787 Sentry Parkway West
Suite 410, Building 18
Blue Bell, PA 19422
(215)367-4333

DATED:  September 24, 2013